Howard B. JORDAN, Jr., Appellant,

v.

AFTON ENGINEERING CO., Inc., et al., Appellees.

No. 14678.

Court of Civil Appeals of Texas.

Houston.

Dec. 9, 1965.

Rehearing Denied Jan. 6, 1966.

Erwin, Wagner & Hodson, Lynn C. Woods, Jr., Houston, for appellant.

Lockett, Brady, Walton & Hooey, Eugene Brady and Dan Walton, Houston, for appellee Afton Engineering Co., Inc.

Kelley, Ryan & Merrill, William J. Merrill, Houston, for appellee Humble Oil & Refining Co.

WERLEIN, Justice.

This is an appeal from a summary judgment.

Appellant, Howard B. Jordan, Jr., brought suit against Afton Engineering Company, Inc., hereinafter referred to as Afton, and Humble Oil & Refining Company, alleging in his unsworn petition that on or about August, 1964, appellant and appellee Afton associated themselves together in a joint venture for the purchase of certain multi-stage centrifugal pumping units for the purpose of resale, lease and/or rental of such units to third parties; that appellant and appellee agreed that each would use his best efforts in purchasing and reselling or leasing three certain pumps owned by Brazos Engineering Company and also in the subsequent purchase, resale and/or lease of multi-stage centrifugal pumping units subsequently discovered by appellant or appellee; that appellant in January, 1965, discovered appellee had purchased in its name said three pumps and seven additional pumps and had entered into a lease agreement with Humble covering the ten pumping units.

Appellant also alleged that he advised appellee he was able and willing to carry out the agreement and he offered to pay his portion of the costs, which appellee refused. He alleged that an accounting

should be had, and he sought a judgment impressing a trust upon the proceeds accruing under the lease to Humble to the extent of his interest.

Appellee Afton in its sworn answer denied all the allegations in appellant's petition and specially denied that it and appellant had associated themselves together as alleged by appellant, and denied that there existed any joint venture or partnership agreement between them as to any of the pumping units described and referred to in appellant's petition.

Humble prayed that the court direct it as to what disposition should be made of monies, if any, held in suspense by it, and that it recover its expense if an accounting was required, and reasonable attorney's fees, costs of court, and general relief.

Appellee filed a motion for summary judgment supported by the pleadings, the deposition of appellant, Howard B. Jordan, Jr., and the affidavit of Ira Q. Mayhew, president of Afton, with copy of the Afton-Humble lease attached as an exhibit. Appellant filed a controverting affidavit made by him.

The court granted the motion for summary judgment, and decreed that appellant take nothing against appellee. The judgment further provides that Humble is entitled to act as a stakeholder or interpleader, and ordered Humble to pay Afton any and all rental payments due and to become due in its agreement with Afton, "less, however, the reasonable attorney's fees and costs incurred by it," and provides Humble shall withhold $1500.00 for attorney's fees and costs in this proceeding. Appellant perfected his appeal from the summary judgment and Afton perfected an appeal as to the portion of the judgment decreeing that Humble was entitled to act as a stakeholder and to recover attorney's fees and costs. Afton later filed in this Court a motion to dismiss its appeal against Humble Oil & Refining Company, which

has been granted, so that such appeal need not be considered further.

Appellant contends that the trial court erred in granting appellee's motion for summary judgment because there was a genuine issue of a material fact as to whether appellant and appellee associated themselves together in a joint venture, and also because there was a genuine issue of a material fact as to whether there existed a confidential relationship between appellant and appellee that would give rise to a constructive trust. The record of a summary judgment proceeding consists of the pleadings whose office it is to outline the claims and defenses of the respective parties, the depositions and admissions on file and the affidavits furnished either in support of or opposing the motion. Gaines v. Hamman, 1962, 163 Tex. 618, 358 S.W.2d 557. The burden of proof is on the movant, and all doubts as to the existence of a genuine issue as to a material fact must be resolved against him, and the pleadings, depositions and affidavits must be reviewed in the light most favorable to the party opposing the motion for summary judgment. Great American Reserve Insurance Co. v. San Antonio Plumbing Supply Co., Tex.Sup.1965, 391 S.W.2d 41. See also Gulbenkian v. Penn, 1952, 151 Tex. 412, 252 S.W.2d 929; Mecom v. Thompson, Tex.Civ.App., 239 S.W.2d 847, ref. n. r. e.

We have carefully considered the affidavits, the deposition of appellant, and the pleadings in order to determine whether any genuine issue of material fact exists. The evidence shows that appellant had formerly been employed by appellee as a salesman, and he had also worked for Brazos for some time in connection with large multi-stage centrifugal pumps; that Afton is a company engaged in manufacturing centrifugal pumps of all sizes, and engaged in handling and selling other manufacturers' pumps, and dealing in used equipment.

Appellant in his deposition testified that he had a conversation with Mr. Mayhew when they were at a lunch together roughly between August and September, at which they discussed business in general, and talked also about the probable value of some pumping equipment that Brazos Engineering and others had and about the possibilities of buying some pumps and selling or renting the same. Appellant testified that on this occasion Mayhew said: "When I get a little money ahead, I am going to think about going and talking to Paul [the manager of Brazos Engineering Company] * * * about buying the rest of these pumps", after which appellant said: "That is fine, I would like to come in for half the money. We should buy them for stock or get busy and try to sell them or rent them to someone."

According to appellant the luncheon discussion concluded by the parties agreeing that they would do this: "whenever the occasion arose; in other words, who got the first deal on these pumps, the chance to buy or sell them, the other would put in half the money for repairing and putting the pumps in shape for sale." When asked whether there was any arrangement discussed as to how the matter would be financed, appellant testified that he was to put up one-half the money and Mr. Mayhew's company would put up one-half the money. He was then asked whether Mr. Mayhew had so stated, and he replied: "I so stated that he agreed that is what we would do, yes, sir." When asked as to whether there was any discussion as to how any indebtedness or loss would be taken care of, he said he didn't believe the matter was discussed, but it was understood the losses would be shared equally. He further testified that "back in August we agreed I would put up half the money cost, half of the money and my best efforts to sell or rent these pumps, any pumps we could own or find we put in the deal, because generally the high cost was in repairing them and getting them out on the job."

Appellant, when asked whether he had given any assistance to Afton in regard to the purchase of pumps, testified:

"I did that by trying to make sure any inquiries on any pump deals, to use that term, would be channeled through Afton Engineering. To explain that better, most of these pumps are in such condition they must be repaired, and by helping them and by discouraging other people from buying them, I was definitely doing Afton Engineering a service."

Q. Was this from any agreed arrangement of any sort?

A. Yes, sir, with Mr. Mayhew that we were going to try to buy them ourselves when the time appeared good to get them at a good price, or at least keep them there until such time as one of the two of us could find a place to put them on a rental basis or sale.

Q. Were you to do anything else in connection with the matter?

A. You mean with Mr. Mayhew?

Q. Yes, sir.

A. I was to put up half the money any time we got the deal.

Q. Did you ever put up any money?

A. Never had a chance, I offered to before this suit was filed and it was ignored.

He further testified that he had offered to bear half the cost of repairing any of the pumps they could get out on a rental basis. When asked if they ever agreed, he said: "Yes, Mr. Mayhew agreed." Then followed:

Q. To pay the bills?

A. Yes, sir. Mr. Mayhew agreed to do that.

Q. Did you ever put up any money or guarantee work on having pumps repaired?

A. No, sir, this was the first deal that had come through that could be worked like this, I would say.

He was later asked as to whether he was trying to say that he had some sort of an agreement about pumps that Afton Engineering Company owned in August, 1964, and the following occurred:

A. Not all of them, no, sir.

Q. Can you tell—

A. Any specific ones?

Q. Any or all.

A. The specific equipment talked about was large, multi-stage pipeline pumps.

Q. All right, what about it?

A. All right, sir, any time that either one of us could find a deal to where these pumps could be repaired and rented or sold, we had agreed I would put up half the money, get them in working condition and sell them.

\* \* \* \* \* \*

Q. Are you trying to say, Mr. Jordan, that Mr. Mayhew or Afton Engineering Company gave you an exclusive right to sell their pumps they then owned?

A. No, sir, I didn't say that at all.

Q. What are you trying to say?

A. On large pipeline pumps, any of them that needed to be repaired, I would put up half the money and we would try to split the profits or realize profits out of it.

Q. You recognize Afton Engineering Company had the right to sell or lease its equipment to anyone it chose to do so, without going to Mr. Howard B. Jordan, Jr., in any way about it, don't you?

A. Yes, sir.

Q. You don't claim there were any other circumstances existing?

A. That is what they are claiming, I claim we had a verbal agreement just the opposite of what you say.

\* \* \* \* \* \*

Q. All right, sir, Mr. Jordan, you do not claim, do you, sir, that any equipment that Afton Engineering Company owned, that if they had it repaired and sold it that you have any interest in it?

A. That is absolutely correct, I did not have, I made it perfectly clear I wanted to stay with very large pumps.

Q. We will stay with very large pumps, any very large centrifugal pumps Afton Engineering Company owned prior to August of 1964 and was then in their possession?

A. No, sir, once again, I agreed to put up money on any of the large jobs, large pumping units, and have an interest in it.

Q. Well, are you—did you—did Mr. Mayhew agree that he wouldn't sell any of these large pumps except that Mr. Jordan would be called upon to put up the money for them?

A. No, sir, on pipeline pumps which we could rent, we agreed that I would be on in the deal. I think Mr. Mayhew will say they generally are looking for financing, and this was our deal.

\* \* \* \* \* \*

Q. Did you present to him any customer that wanted to lease one?

A. No, sir, we agreed in this case of jointly-owned, whoever got the deal— in this case he got there first.

When asked with respect to the allegations in his petition that he gave confidential information to appellee concerning the three pumps owned by Brazos Engineering Company, Inc., he was asked also whether those were the only pumps that he had given Mr. Mayhew any confidential information concerning and replied: "No, sir, I discussed other pumps with Mr. Mayhew and other parts of pumps."

Q. I am talking about confidential information, Mr. Jordan.

A. I agreed that possibly confidential is the wrong term to use there.

He was then asked what was the nature of the information that he had given that was not available to other people, and he stated that it was available to people who know the business, and that very few people had looked at the pumps and talked to Brazos about them, and that he was not saying any information they got by such means was confidential information, or different from information that he had if they understood the equipment. He was then asked as to the conversation he had with Mr. Mayhew before he departed for California in December, 1964, and answered:

"I believe that I called Mr. Mayhew several days before I left, possibly the day before I left, to let him know how he could get in touch with me in San Francisco, the gist has been told, we had several deals working, one with International and one with Mac Wood and if he needed any money or anything else, to facilitate him getting hold of me so there would be no holdup on any customers we might have."

Q. Did he accept your offer?

A. Obviously he did not or we wouldn't be in this office.

Q. Never called you or called upon you for any monies?

A. No, sir.

Later he testified, when asked whether in the discussions he had with Mr. Mayhew there was any discussion concerning how the title to the equipment would be taken or in whose name it would be taken or how it would be handled, "I trusted Mr. Mayhew and his verbal agreement at the time was

fine with me, it could have stayed in the Afton title or under a joint venture agreement."

Q. Was there any agreement between you?

A. It was agreed between us it would be a partnership.

Q. Was the term "partners" ever used?

A. No, sir, it would be a formal term never used.

We quote the following pertinent testimony:

Q. Any matter he might do in furtherance of this matter you talked to him about, you had some right to make determination of whether you would put up money or not?

A. Yes, sir.

Q. You reserved that right to yourself?

A. I suppose so.

Q. You know you did?

A. Sure.

He also testified:

A. Anything he wanted to do I agreed he could go ahead and do it as long as I was included in the thing.

Q. Did you have any right to approve it?

A. Yes, sir, I did because he told me he would honor and approve all these arrangements on the equipment sitting over there.

Q. I am asking if you, as I understand, reserved to yourself a right to determine for yourself—whether or not you would put any money into any request he might make?

A. Yes, sir, he would call me and say 'Do you want to do this.' He did just

the opposite, he went and violated the deal without even discussing it.

In his affidavit appellant stated that Afton was short of money; that at the luncheon in about August he and Mr. Mayhew discussed business in general terms and specifically multi-stage centrifugal pumping units, and that appellant offered to put up half the money to repair the pumps; that Mr. Mayhew said he liked this arrangement * * * "and that we should go into together but that we would have to adjust Afton's owning the pumps." Appellant also stated that he was familiar with the pumps; that he had spent approximately six months with Brazos' pumping division, as manager, and that he knew there were four pumps located there; and that he thought they could get them for about $8,000.00 and that he could arrange good terms with Brazos; that Mayhew then wanted to know where they would try to sell these first pumps and that appellant told him that he had made some contacts while with Brazos, and that he was only interested in large multi-stage pumping units, and that if Afton was short of money he had approximately $35,000.00 to $45,000.00 cash available in various savings and checking accounts that he could get his hands on. He then said in his affidavit:

"In addition to sharing the costs of purchasing such large pumping units and repairing them it was agreed between Mr. Mayhew and myself that since I was primarily in the used-machinery business and had many contacts to learn where this equipment was coming up for surplus sale, that I would primarily try to find the equipment and use my card file to get in touch with prospective purchasers, and that Afton would store the equipment on their lot and use their shop facilities to renovate such equipment and put it in condition so that it could be resold or leased. We then shook hands on the deal and it was agreed on the drive back from luncheon that sometime in the next few weeks Mayhew would send John Bergner, an employee of Afton, to my office to go

over my plan of locating such pumps and to draw up advertising material to merchandise the equipment.

"As I understood my relationship with Afton, we would each use our best abilities to buy, repair, and sell or lease large multistage centrifugal pumping units. I was to put half of the money and to do everything possible to locate such pumps, to use my contacts, to check the various trade journals, and to draw up and mail circulars to persons in my card file whose companies I felt would be interested in such large pumping units."

It is our view that appellant raised a fact issue as to there being an agreement between him and appellee to enter into a joint enterprise or venture to purchase and repair large multi-stage centrifugal pumping units for sale or lease, with each party putting up one-half of the cost and sharing equally in any profits realized with the option in appellant to accept or reject any specific proposition submitted to him by appellee. It is true that appellant's testimony is redundant and sometimes possibly contradictory, but in considering the same in the light most favorable to him and resolving all doubts in his favor and against the movant, as we are required to do, we are of the opinion that there is some evidence of probative force which raised a fact issue. If we are correct in so holding, then it would follow as a matter of law that the parties would stand in a fiduciary relation within the scope of the enterprise and each would be obligated to exercise the utmost good faith in all endeavors relating to their common interests. Neither could lawfully obtain for himself or itself any secret profit or advantage in carrying on the common enterprise. Griffin v. Reilly, Tex.Civ.App., 275 S.W. 242; Fitz-Gerald v. Hull, 1951, 150 Tex. 39, 237 S.W.2d 256. See also 30 Amer.Jur., pp. 974–975, Joint Adventures, Sec. 48.

In the instant case, the evidence is undisputed that appellee leased ten pumps to Humble without first consulting appellant or giving appellant an opportunity to exercise his option to participate in the deal, and that no accounting has been made to appellant. It is our view that appellant has raised a fact issue as to whether a constructive trust existed as to some or all of the ten units leased to Humble by appellee. The burden was upon appellee to demonstrate that there was no genuine issue of material fact. This it has failed to do. Our Supreme Court, in the recent case of Gaines v. Hamman, 1962, 163 Tex. 618, 358 S.W.2d 557, said:

"The important circumstance from which the law will raise a constructive trust is the breach of a confidential relationship which may exist, although such relationship may not meet the technical requirements of a partnership or joint venture. Mills v. Gray, 147 Tex. 33, 210 S.W.2d 985."

The Court also said:

"If conflicting inferences may be drawn from the deposition and from the affidavit of the same party, a fact issue is presented. United States Fidelity & Guaranty Co. v. Carr, Tex.Civ.App., 242 S.W.2d 224, wr. ref., New St. Anthony Hotel Co. v. Pryor, Tex.Civ.App., 132 S.W.2d 620, wr. ref. It is not the purpose of the summary judgment rule to provide either a trial by deposition or a trial by affidavit, but rather to provide a method of summarily terminating a case when it clearly appears that only a question of law is involved and that there is no genuine issue of fact."

We are of the opinion that the present record does not disclose a case for summary judgment. Fitz-Gerald v. Hull, supra; Omohundro v. Matthews, 161 Tex. 367, 341 S.W.2d 401. Appellant has included in his cause of action a claim against Humble. There has been no severance of such claim and no trial which would warrant affirming the trial court's judgment as to Humble as requested by Humble in its argument before this Court.

Reversed and remanded.