**Bill MATHIS, Appellant,**

v.

**CACTUS DRILLING CORPORATION and Frank M. Late, Appellees.**

No. 11594.

Court of Civil Appeals of Texas.

Austin.

June 12, 1968.

Rehearing Denied July 10, 1968.

Runge, Marschall, Hall & McLaughlin, San Angelo, Hudson, Keltner, Smith & Cunningham, Luther Hudson, Fort Worth, for appellant.

Griffis, Smith, Davis, Rose & Finley, George S. Finley, San Angelo, for appellees.

O'QUINN, Justice.

This appeal is from a summary judgment in district court of Tom Green County decreeing that the plaintiff take nothing in a suit for accounting under a former partnership.

Bill Mathis, a resident of Midland County, sued Frank M. Late of Tom Green County and Cactus Drilling Corporation for an accounting and to recover an interest in certain oil and gas properties in Montezuma County, Colorado.

Suit was brought in September, 1966. Both parties filed extended original and amended pleadings, together with briefs and memoranda, in the trial court.

Both plaintiff and defendants filed motions for summary judgment which were heard in September, 1967. In addition to the pleadings and briefs, the trial court considered nine written and oral depositions of parties and witnesses, as well as requests for admissions and interrogatories on file in the cause.

In an order entered September 13, 1967, the trial court denied the motion of Mathis for summary judgment and granted the motion of Late and Cactus Drilling Corporation. From a take nothing judgment, Mathis has perfected his appeal.

We affirm the judgment of the trial court.

In September, 1960, Bill Mathis and Frank M. Late entered into a written agreement under which they engaged in various phases of the oil and gas business. Sometime later, the parties agreed that Cactus Drilling Corporation, of which Late was president and chief executive officer, as well as the principal and controlling stockholder, would be substituted for Late as the partner with Mathis.

Cactus Drilling Corporation was a company engaged in contract drilling for oil and gas operators, and also engaged in oil and gas exploration and related business for itself. The agreement of September, 1960, provided that Mathis would work with Cactus Drilling in connection with a federal filing program and in connection with securing other types of oil and gas deals.

Under the agreement, after Cactus Drilling recovered the money it put into a venture, the profits derived, whether in cash or in retained property, were divided equally between Mathis and Cactus Drilling. In a majority of the ventures during 1962, 1963, and 1964, Mathis paid one-half of all costs, whether for acquisition or drilling, and was owner of one-half of whatever interest Cactus Drilling acquired.

In a few instances, Mathis and Late had an arrangement under which Mathis bore no part of costs of the test well, but had a carried working interest amounting to twenty percent of the Cactus Drilling interest. In such cases, Mathis had no interest in the income from the test well until Cactus Drilling recovered its money, after which Mathis owned twenty percent of the interest Cactus Drilling had and paid twenty percent of the costs. On subsequent wells, under this arrangement, Mathis owned twenty percent, but his interest was not carried and he paid a like percentage of costs and expenses.

Under the agreement of September, 1960, Mathis did not share in any of the profits of Cactus Drilling derived from its ordinary drilling contract business, and was not responsible for losses sustained from such operations.

Mathis and Cactus Drilling operated under the terms of their agreement until about the middle of 1964. In July of that year Mathis and Late agreed to bring to an end their working arrangement under the contract. By August 4 the parties had reached a final financial settlement, although several unresolved matters continued to be the subject of their mutual attention for some six to eight months thereafter.

This lawsuit grows out of transactions which had their origin late in 1963 when Pan American Petroleum Corporation advised Late that Pan American was considering drilling a well on acreage owned by Pan American in Montezuma County, Colorado. To support the proposed well, Pan American wanted to obtain some acreage owned by Texaco Inc. and Aztec Oil and Gas Company immediately north of the Pan American acreage. Pan American preferred that Cactus Drilling "front the deal" and asked Late to secure a farmout agreement from Texaco and Aztec as a favor to Pan American.

Both Mathis and Cactus Drilling had benefited in the past from good relations with Pan American. Mathis and Late agreed to assist Pan American without expectation of being paid for their services, although it was expected Cactus Drilling might benefit by award of the drilling contract from Pan American.

Mathis undertook negotiations with Texaco and Aztec, and after several months Mathis succeeded in obtaining the farmout in the name of Cactus Drilling. The farmout was submitted to Pan American and approved by that company before Cactus Drilling executed the agreement. This agreement was dated July 20, 1964. Shortly after the farmout agreement was completed, and while it was still in the name of Cactus Drilling, but being held for Pan American, the business relationship between Mathis and Cactus Drilling was terminated.

Late in August, more than a month after the farmout had been taken with Texaco and Aztec, Pan American advised Late that Pan American was not eager to drill on its Colorado acreage and would like to work out some arrangement whereby Cactus Drilling would drill the well instead of Pan American. An agreement was reached under which Cactus Drilling, at its expense, would drill the well to the casing point on Pan American acreage, and for drilling the well would receive a one-fourth interest in a part of the Pan American acreage, a bottom hole contribution from Pan American in the amount of $43,750, and an undivided one-fourth interest in the Texaco-Aztec farmout agreement. The approximate cost of drilling the well to the casing point was $60,000 to $80,000.

The first well drilled by Cactus Drilling on the Pan American acreage was a productive well. Most of the wells thereafter drilled jointly by Pan American and Cactus Drilling on the Pan American acreage were productive. The test well drilled jointly by Pan American and Cactus Drilling on the Texaco-Aztec farmout acreage also was productive. After the venture proved successful, and after a number of wells had been drilled, Mathis brought this suit for an accounting by Late and Cactus Drilling.

Mathis alleged that Cactus Drilling at no time advised him of the Pan American proposal and did not at any time give Mathis an opportunity to participate in the venture. Mathis took the position that Cactus Drilling appropriated the deal solely to itself and drilled the test well which was productive. The suit, Mathis said, was brought to establish that Cactus Drilling held the Montezuma County property as constructive trustee for Mathis for a one-half interest and for one-half of the net profits for an accounting.

The contention made by Mathis that he is entitled to share with Cactus Drilling in the Pan American venture is grounded upon facts stated in his brief as follows:

(1) Mathis and Cactus Drilling operated a partnership business at a profit from

early September, 1960, until they agreed on a dissolution July 19, 1964, and the actual termination of the partnership was not completed until after March 1, 1965.

(2) The title Cactus Drilling acquired grew out of the partnership business. Specifically, Mathis obtained the Texaco-Aztec farmout in the name of Cactus Drilling as a part of the partnership business, and the Pan American deal was the result of the Texaco-Aztec farmout transaction by the partnership.

(3) Late and Cactus Drilling at no time gave Mathis an opportunity to participate in the Pan American deal and at no time recognized his rights.

Mathis argues that it is immaterial whether this is a case of tracing a partnership asset or a case of one partner appropriating an opportunity to himself to the exclusion of the other partner. The statutory expression of this proposition, Mathis avers, is in the Uniform Partnership Act, Article 6132b, in the following section:

"Sec. 21 (1) Every partner must account to the partnership for any benefit, and hold as trustee for it any profits derived by him without the consent of the other partners from any transaction connected with the formation, conduct, or liquidation of the partnership or from any use by him of its property."

Mathis relies upon the rule announced in Meinhard v. Salmon, 249 N.Y. 458, 164 N. E. 545, 62 A.L.R. 1, that upon the theory of constructive trust for his benefit a partner may hold another partner bound by fiduciary ties to account for profit or advantage derived from their relationship. In that case Salmon negotiated and obtained for himself a new lease on certain property he and Meinhard had been leasing and operating under a joint venture agreement. The new lease included adjoining property not in the original lease. The court sustained Meinhard's claim to interest in both the original and adjoining property on the

theory of constructive trust for his benefit. Smith v. Bolin, 153 Tex. 486, 271 S.W.2d 93.

These principles of law, Mathis argues, are further established in Johnson v. Peckham, 132 Tex. 148, 120 S.W.2d 786, 120 A.L. R. 720, in which Mr. Justice Cardozo in Meinhard v. Salmon is quoted. Mathis also includes in the body of case law applying the rule the following cases: MacDonald v. Follett, 142 Tex. 616, 180 S.W.2d 334; Jordan v. Afton Engineering Co., 397 S.W. 2d 512 (Tex.Civ.App., Houston, no writ); Donnelly v. Guthrie, 194 F.2d 164 (5th Cir. 1952); Fouchek v. Janicek, 190 Or. 251, 225 P.2d 783 (1950).

Cactus Drilling and Late contend that the Mathis-Cactus combination had never held title to the Texaco-Aztec farmout and that this farmout agreement had never been considered a property "they should jointly operate for profit."

In Collins v. Gee, 107 S.W.2d 754 (Tex. Civ.App., San Antonio, writ ref.), relied on by Cactus and Late, the partners had owned a certain property but had "voluntarily parted with every vestige of interest or title to the property" which left each partner free thereafter to deal with the property as he saw fit "and under no duty to notify or consult his former associates, or account to them." One of the partners had repurchased the property "at his own risk and with his own resources." The court held that the other partners were "not entitled after waiting until the venture proved fruitful, to require appellee [the partner who purchased] to share the profits of his investment with them." (107 S.W.2d 754, 755)

We think the decision in the case at bar turns on whether the Texaco-Aztec farmout was such a property of the Mathis-Cactus relationship as to make it a subject matter of the joint undertakings for profit.

Neither Mathis nor Lake considered the Texaco-Aztec farmout a property of Cactus Drilling, although it had been taken in the

name of Cactus. Both Mathis and Late regarded this farmout as an agreement belonging to Pan American and obtained for Pan American as a favor.

Neither Mathis nor Cactus Drilling had any connection with or interest in the Pan American leases. The proposition Pan American made to Cactus Drilling, about August 28, 1964, was that Cactus would drill a well on the Pan American acreage. Undoubtedly Pan American had the legal right to drill a well on its own acreage, or to contract the drilling with another party, without reference to whether any trade had been made with Texaco-Aztec.

The Texaco-Aztec farmout agreement provided that the first test well would be drilled on Pan American acreage, not on the Texaco-Aztec acreage. The well was to be drilled at the sole cost of the farmout party and to a specified depth and within a certain time. If the well drilled on Pan American acreage were drilled according to the agreement, then the farmout party would have an option to drill a test well on the Texaco-Aztec acreage at the sole cost of the party drilling. If the second well, the test well drilled on Texaco-Aztec acreage, were productive, then Texaco-Aztec would assign a one-half interest in the Texaco-Aztec lease to the farmout party.

When Mathis delivered the Texaco-Aztec farmout agreement, it was the property of Pan American. When Cactus and Mathis agreed late in July or early in August, 1964, to bring their working arrangement to an end and go their separate ways, the Texaco-Aztec farmout was still the property of Pan American, and no proposal had been made to change that status.

We think it clear from the record that Mathis and Cactus did not consider either the Pan American leases or the Texaco-Aztec leases as properties within the purview of their joint activities or joint undertakings. The only connection Mathis and Cactus had with these properties was to accommodate Pan American by obtaining the farmout from Texaco-Aztec. This was accomplished before Mathis and Cactus brought their relationship to an end.

Mathis had no obligation under the Texaco-Aztec farmout. His involvement began when he agreed as a favor to Pan American to work out an agreement and ended when Texaco and Aztec agreed to the farmout. Late and Mathis did not discuss the Texaco-Aztec farmout in winding up their joint business. Mathis believed at the time of the dissolution agreement that the Texaco-Aztec farmout "was still a good will deal" and that it was "for Pan Am. and Cactus is holding it." Mathis was completely through with the farmout at the time his business arrangement with Cactus was terminated. Whatever obligation Cactus had by reason of the farmout being in its name must have been assumed by Cactus in the hope, recognized by Mathis and Late, that Pan American would award to Cactus the drilling contract.

It appears to be the contention of Mathis that when the hope Cactus had entertained, which Mathis acknowledged without objection, was realized in a form other than as a contract driller, Mathis was entitled to the opportunity to share, if he so desired, in the proposal made by Pan American.

There is nothing in the record to indicate that either Mathis or Cactus had any agreement or understanding with Pan American that the Texaco-Aztec farmout would lead to an offer or opportunity in the future to share in the farmout on any basis, except that perhaps Cactus might be asked to drill one or more wells. The history of the relationship between the Mathis-Cactus combination and Pan American began with Mathis getting leases for Pan American from a company Pan American could not deal with because of "bad feeling" growing out of a lawsuit. Afterwards over a period of time Mathis and Cactus were tendered altogether nearly a dozen profitable deals by Pan American, none apparently directly connected with the accommodation transaction, but tendered presumably because of

the good will growing out of the earlier favor.

Mathis contends that this form of good will was such that if it brought Cactus an opportunity after dissolution of the Mathis-Cactus partnership, Mathis should have a chance to share in it. To sustain this position it would be necessary to hold that the friendship or good will of Pan American generated through past favors had become such a property of the Mathis-Cactus partnership that after its dissolution Pan American would be unable to deal with one partner without the other having a right to share in the proposal. Such was not the nature of the property that was the subject matter of joint undertakings for profit in Meinhard v. Salmon, Johnson v. Peckham, Fouchek v. Janicek, Donnelly v. Guthrie, and Jordan v. Afton Engineering, supra.

■■■ It is a general rule that when partners bring their relationship to an end and agree upon financial settlement, the duty of good faith and the fiduciary ties also come to an end, except as to the specific matters which may be the subject of liquidation. No such unfinished business is involved in this lawsuit. The Texaco-Aztec agreement, never the property of the Mathis-Cactus enterprises, had been wound up and was the property of Pan American, even though not yet formally assigned. It was so treated without reservation by both Mathis and Late.

■■■ The good will urged by Mathis to be such property of the partnership, even after dissolution, as to invoke the continuing protection of fiduciary ties was, in our opinion, instead the property of the partners separately, as distinguished from joint ownership under the working agreement. Mathis and Cactus continued after dissolution of their partnership arrangement to pursue the same business. There was no agreement between them disposing of the Pan American good will, or any other of the partnership's good will. Each was lawfully free to make such use of the Pan American good will as might best serve the several interests of the former partners. Rice v. Angell, 73 Tex. 350, 11 S.W. 338, 3 L.R.A. 769.

In the Meinhard, Johnson, Fouchek, and Jordan cases the property was still being operated by the joint enterprise, or the essential nature of its business was still being carried on, when the erring partner violated the fiduciary tie with profit to himself, to the exclusion of the other partners.

In Donnelly v. Guthrie, supra, the partners had sold the property, which was later reassigned without consideration to Guthrie, the partner in whose name the property had been held before its sale. The subject matter of the joint enterprise was an oil and gas lease which had been placed in Guthrie's name and sold by the partnership at a profit. About two years later Guthrie learned on a visit to the purchasing company's office that the purchaser did not intend to pay the delay rentals on part of the leased lands. At the request of Guthrie, and without the knowledge of Donnelly, the purchaser reassigned the leases on this acreage to Guthrie without cost when he agreed "to try to get a well drilled" on the lands. Guthrie did not advise his former partner, paid the delay rentals for three years on about 2,000 acres, and then sold the lease in two parcels at a net profit of over $30,000. The court held Guthrie accountable to Donnelly "for his share of the net profits accruing from the resale of parts of the returned leases."

The appellate court held the trial court erred in finding that as a separate transaction Guthrie had "*bought* back the part of the leases from" the purchaser. The promise to try to get a well drilled was unenforceable, and the reassignment was therefore without consideration. The court found that "the evidence shows that the motive for the return of part of these leases to Guthrie was mainly, if not solely, the fact that the leases had been taken in his name and he had assigned them to" the purchaser. The court stated, "Guthrie can-

not thus be permitted to profit personally by reason of his fiduciary relation to Donnelly."

We think it clear that Donnelly v. Guthrie is distinguished from the case before us because the Texaco-Aztec farmout never had been the property of the Mathis-Cactus partnership, even though it was held nominally by Cactus, and, further, the interest Cactus later acquired in the farmout was not a gratuitous assignment. Just as the purchasing partner did in Collins v. Gee, supra, Cactus acquired interest in the Texaco-Aztec farmout at its "own risk" and with its "own resources."

Mathis has assigned six points of error. The first three are briefed together. Under them Mathis contends that there was such fiduciary relationship as far as the property in this suit was concerned as to hold Cactus and Late accountable as constructive trustees because Mathis was not permitted to participate in any opportunity which grew out of or was a part of the Mathis-Cactus partnership. The fourth and fifth points are briefed together under which Mathis contends that a partnership was established as a matter of law, or there was a fact issue as to a partnership, and at the time Pan American tendered the Montezuma County deal to Cactus and Late the fiduciary obligations had not ceased. The sixth point is the error of the trial court in not rendering judgment establishing a constructive trust for an interest in the property acquired by Cactus in the Montezuma County deal with Pan American.

In view of the conclusions we have reached and stated earlier, we overrule all of the points of error presented by appellant.

We find that the trial court correctly decided that appellant had no cause of action as a matter of law on the basis of the record before it and properly entered judgment for appellees on their motion for summary judgment.

The judgment of the trial court is affirmed.