NATIONAL SOIL SERVICES, INC.,
Bruce G. Purcell, Harold J. Moening,
James A. Hamilton, d/b/a Alaska Geo-
logical Consultants, Inc., Northwest Ex-
ploration Services, Inc., and Ralph S.
Reuss, Appellants and Cross-Appellees,

v.

Ray E. HURST, Appellee and
Cross-Appellant.

Nos. 4359, 4639.

Supreme Court of Alaska.

June 26, 1981.

Peter Walton and Michael Jungreis, Peter Walton & Associates, Anchorage, for appellants and cross-appellees.

R. Everitt Harris, Jensen, Harris & Roth, Anchorage, for appellee and cross-appellant.

Before RABINOWITZ, C. J., CONNOR and BURKE, JJ., and CARLSON and HODGES, Superior Court Judges.

## OPINION

CONNOR, Justice.

National Soil Services [NSS] and the other defendants appeal from a judgment awarding Hurst $23,338.00. Hurst cross-appeals from the same judgment.

On March 24, 1969, the Trans Alaska Pipeline System [TAPS] sent Alaska Geological Consultants [AGC], a partnership comprised of Hamilton, Moening, and Purcell (all were defendants in the action in the superior court), an invitation to submit a proposal for subsurface exploration and laboratory testing. The exploration and testing involved sinking boreholes on land and offshore, as well as the recovery and analysis of the obtained samples to establish the geophysical make-up of the tested areas. TAPS set April 10, 1969, as the deadline for bid submission.

Moening, of AGC, told Hurst about the bid. Hurst then suggested that AGC and he bring in Reuss of NSS to help prepare the bid. Telephone calls followed, and finally Hurst hand-carried the proposed bid to Reuss in Houston, Texas. After corrections by Reuss, Hurst took the bid to TAPS. At the time of bid submission, there was no specific relationship among Reuss, Hurst and AGC. TAPS accepted the bid proposal on April 24, 1969.

In order to begin the project for TAPS, known as TAPS/9, Reuss traveled to Anchorage and formed a joint venture with AGC on May 14, 1969. An agreement known as Supplement No. 1 to the May 14th joint venture agreement entitled Hurst to receive one-third of the profits of the joint venture. Hurst is not mentioned in the agreement itself, only in the supplement.

The joint venture drilled around Jackson Point near Valdez, and began demobilization around July 24th. The due date for the subsequent lab work was October 1, 1969. The joint venture submitted its report in two volumes to TAPS by October 1, 1969.

About October 10, 1969, AGC learned that TAPS wanted additional boreholes at Valdez in close proximity to the boreholes drilled under TAPS/9, which had just been completed. AGC submitted a proposal for the additional drillings, designated TAPS/105, which was accepted on October 16, 1969. That same day, AGC and NSS entered into a joint venture to complete the work under TAPS/105. Hurst was not mentioned in the October 16th joint venture agreement.

The profits from the TAPS/9 project amounted to $207,078.00 and were split three ways. The profits from the TAPS/105 project were $305,376.00.

During the superior court trial, Hurst did not claim, and presented no evidence, that he failed to receive profits due from the TAPS/9 project. Rather, Hurst claimed one-third of the TAPS/105 project profits because, he argued, the TAPS/105 project was within the bounds of the May 14th joint venture agreement or, alternatively, AGC and NSS breached their fiduciary duty as joint venturers by excluding Hurst from the TAPS/105 profits. On November 8, 1978, the superior court awarded Hurst $23,338.00 from what the court believed to be an improper accounting of the TAPS/9 profits. In so doing, the court also found that Hurst was not entitled to any TAPS/105 profits. These appeals followed.

## THE APPEAL

■ NSS and the defendants challenge the judgment below, asserting that Hurst did not claim recovery on the basis relied upon by the superior court, and that no evidence in the record supports such a recovery. Hurst concedes this argument.

AGC had borrowed $77,580.00 from the May 14th joint venture. With the loan, AGC lease-purchased equipment for use by the joint venture, in accordance with the May 14th agreement. AGC subsequently reimbursed the joint venture for $70,014.00. The superior court found that the reimbursement should have been split among the three parties, instead of being credited to the capital balance of AGC. A finding that the $70,014.00 should be split among the three parties is not supported by any evidence. It is, therefore, clearly erroneous and must be reversed. Alaska R.Civ.P. 52(a); *Martens v. Metzgar*, 591 P.2d 541, 543–44 (Alaska 1979); *Chugach Electric Ass'n v. Northern Corp.*, 562 P.2d 1053, 1060 n.22 (Alaska 1977).

## THE CROSS–APPEAL

Supplement No. 1 to the May 14th agreement provided that the profits of the joint venture were to be split equally among Hurst, NSS, and AGC. In order to determine the profits of the joint venture, the superior court first had to determine the venture's scope. The court found that the participants in the May 14th agreement intended the scope of the agreement to cover only the work performed under TAPS/9, thus entitling Hurst to a share of the TAPS/9 profits. Hurst challenges this finding as clearly erroneous and would have us hold that the scope of the May 14th agreement included both TAPS/9 and TAPS/105, thus entitling Hurst to a share of the profits from both projects.

The scope of the joint venture is set out in paragraph one of the May 14th agreement:

"to provide all labor, materials, equipment and necessary personnel, to perform soil boring, laboratory tests, geologic interpretation and foundation engineering for the TRANS ALASKA PIPELINE SYSTEM of Houston, Texas, in conjunction with the building of a TANKER BERTHING and OIL STORAGE FACILITY at Valdez, Alaska, hereinafter called the PROJECT."

Supplement No. 1 to the May 14th agreement states that AGC and NSS:

"Have agreed to provide all necessary labor, tools, personnel and financing to complete the study in accordance with the contract and specifications with Trans Alaska Pipeline Company."

Supplement No. 1 further provides that Hurst:

"will provide consultation, supervision and other related talents and experience to assist the joint venture in successful completion of the PROJECT."

In order to determine the meaning of the agreement, the superior court focused on the words "project, study, and contract." In the AGC bid proposal documents, submitted on April 8th and April 17th and signed by all three parties, the words "study" and "project" are used interchangeably in referring to the work that later became designated as TAPS/9. Thus the superior court found that the words "project, study, and contract" in the May 14th agreement referred only to TAPS/9, and rejected the broader interpretation urged by Hurst.

The court's finding is supported by other evidence in the record. There is no evidence that any of the parties contemplated, at the time the joint venture agreement was made, additional borings or another contract with TAPS beyond TAPS/9. The parties began the drilling around Jackson Point in Valdez during the summer. After drilling all of the plotted holes, AGC asked the TAPS representative if there were more holes to drill because the additional holes should be started before AGC demobilized the equipment. The TAPS representative replied that there were no others. The joint venture demobilized the drilling equipment by July 24th. The report was prepared and sent to TAPS by October 10, 1969. Reuss, the sole owner of NSS, testified that he considered the joint venture completed when the report was sent to TAPS. Near the time of the demobilization, Hurst talked with Moening about going into business with Hurst, without the others, since the job was almost over.

Paragraph three of the May 14th agreement specified that the profits were to be divided only at the completion of the project. Hurst was given a check for part of his share of the profits in August or September. Later he received two other checks on November 22nd and December 10th. On the latter occasion, Hurst indicated to Reuss that he knew that AGC and NSS were drilling at Valdez under TAPS/105, but he raised no complaints or questions as to why he was not included. The superior court inferred that the joint venture profits were being divided when Hurst received the checks because all parties assumed that the scope of the May 14th agreement had been completed, and Hurst's silence indicated his acknowledgement of the completion of the joint venture.

Hurst's strongest argument that the superior court's finding is clearly erroneous is that all of the work done under TAPS/105 could have been done under the broad description in the May 14th agreement. Since the description in the May 14th agreement is not explicitly linked to a particular TAPS contract, and is not linked to explicit geographic boundaries, the TAPS/105 area drillings which were adjacent to the TAPS/9 area drillings could have come under the May 14th agreement. Hurst notes a number of similarities between the TAPS/9 drilling and the TAPS/105 drilling. AGC's records describe both contracts with the same job number.[1] The same bank and account number were used for both jobs. Certain price quotations for the winter drillings were the same as for the summer drillings. The TAPS/9 report was numbered volumes 1 and 2, the TAPS/105 report followed the same format and was labeled volume 3. Hurst argues that these similarities are circumstantial evidence that TAPS/105 was a continuation of TAPS/9,

and therefore that the complete project was within the May 14th agreement.

Hurst makes two additional arguments to establish that TAPS/105 was within the contemplation of TAPS/9. Given TAPS's ability to request more borings during TAPS/9, Purcell of AGC admitted that he could have reasonably expected to drill, under TAPS/9, in the same place where AGC and NSS drilled under TAPS/105. Hurst claimed that TAPS did not have an option to purchase or lease the land tested under TAPS/9 and that this was common knowledge; thus the parties could assume they would be requested to drill in other areas.[2]

■ We have held on a number of occasions that we will not disturb trial court findings unless we are convinced that they are clearly erroneous. Alaska R.Civ.P. 52(a); *Martens v. Metzgar*, 591 P.2d 541, 543–44 (Alaska 1979); *Alaska Gay Coalition v. Sullivan*, 578 P.2d 951, 956 n.7 (Alaska 1978). A finding is clearly erroneous if we are left with

> "a definite and firm conviction on the entire record that a mistake has been made, even though there may be evidence to support the finding." (footnote omitted).

*Martens v. Metzgar, supra,* at 544. In this case, there is evidence to support either a broad scope or a narrow scope for the May 14th agreement. The finding that the May 14th agreement is limited to TAPS/9 does not appear to us as clearly erroneous, in light of the whole record. The finding must be sustained.

We now reach Hurst's second theory of recovery. He contends that as a joint venturer with NSS and AGC, the latter two violated the fiduciary duty owed him as a co-venturer by excluding him from the TAPS/105 project.

---

1. The job number was assigned by a secretary in AGC's office. The same number indicates the same general geographic location for the job. As such, the job number carries little independent weight that TAPS/105 was a continuation of the "project" under the May 14th agreement, other than corroboration that TAPS/105 and TAPS/9 drillings were in the same general area.

2. The superior court specifically rejected Hurst's argument that the common knowledge of TAPS's failure to secure an option on the Jackson Point land should have alerted AGC and NSS that additional drilling would be required. Finding of Fact No. 11.

The superior court did not explicitly reach the issue of Hurst's relationship with NSS and AGC under the May 14th agreement. The court determined that even if Hurst was a joint venturer, NSS and AGC did not violate their fiduciary duty toward Hurst.

Our case law does appear to support Hurst's contention that he was a joint venturer.[3] But it is unnecessary to engage in an extended discussion of that proposition if, like the superior court, we conclude that any claimed fiduciary duty to Hurst was not breached. Assuming, arguendo, that a fiduciary duty was owing to Hurst by reason of the May 14th agreement, we have considered the authorities relied upon by Hurst in his argument that a breach of duty occurred.

■ The bounds of the fiduciary duty owed co-venturers were set out in the classic case of *Meinhard v. Salmon*, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (Cardozo, J.):

"Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty."

In that case Meinhard and Salmon had formed a joint venture to operate and maintain a building under a 20-year lease. Meinhard contributed money, Salmon managed the building. With less than four months left on the original lease, Salmon took another 20-year lease on a larger tract, encompassing the building used in the joint venture as well as surrounding buildings, but excluded Meinhard from the deal. The court held that the exclusion was a breach of Salmon's fiduciary duty. *Id.* 249 N.Y. 458, 164 N.E. at 548. It is important to note that this duty is owed only while the venture continues.

■ In the case at bar the venture had ended at least by October 1st, when the TAPS/9 report was submitted. By mid-October, when the TAPS/105 project was secured, any exclusion of Hurst would not have been a breach of fiduciary duty toward him.

■ Hurst's reliance on a number of cases is misplaced. They are distinguishable for various reasons. First, in the following cases, business was transacted as a partnership. *See Demmert v. Demmert*, 14 Alaska 425, 115 F.Supp. 430, 433–34 (1953); *Mathis v. Meyeres*, 574 P.2d 447, 448–49 (Alaska 1978). The scope of fiduciary duties owed between partners inter se is often broader from that owed by joint venturers inter se. *See* Note, Apparent Authority and the Joint Venture: Narrowing the Scope of Agency Between Business Associates, 13 U.C.Davis L.Rev. 831, 857 n.132 (1980).

■ In other cases, the business relationship was *ongoing* at the time that the purported breach of a fiduciary duty occurred. *See Anderson v. National Producing Co.*, 253 F.2d 834, 836–37 (2d Cir.), *cert. denied*, 357 U.S. 906, 78 S.Ct. 1151, 2 L.Ed.2d 1157 (1958); *Libby v. L. J. Corp.*, 247 F.2d 78, 81–82 (D.C.Cir.1957); *Kaye v. Smitherman*, 225 F.2d 583, 592 (10th Cir.), *cert. denied*, 350 U.S. 913, 76 S.Ct. 197, 100 L.Ed. 800 (1955); *Eagle-Picher Co. v. Mid-Continent Lead & Zinc Co.*, 209 F.2d 917, 920 (10th Cir.1954); *Dexter & Carpenter, Inc. v. Houston*, 20 F.2d 647, 653 (4th Cir.1927); *Cascaden v. O'Connor*, 257 F. 930, 932–33 (9th Cir.1919); *Northern Lights Motel, Inc. v. Sweaney*, 561 P.2d 1176, 1187 (Alaska 1977); *Air Purification, Inc. v. Carle*, 99 Cal.App.2d 258, 221 P.2d 700, 701, 704 (1950); *San Francisco Iron & Metal Co. v. American Milling & Industrial Co.*, 115 Cal. App. 238, 1 P.2d 1008, 1010 (1931). In the case at bar, however, the joint venture had terminated. Regardless of whether a partnership or a joint venture existed, once the business arrangement has terminated, the activities of former confederates are transacted in their individual capacities and not in their capacities as joint venturers or partners. Thus, to the extent a fiduciary relationship existed, it was terminated prior to the purported breach in the present case.

---

**3.** *See Nicholas v. Moore*, 570 P.2d 174, 178 (Alaska 1977); *Northern Lights Motel, Inc. v.*

*Sweaney*, 561 P.2d 1176, 1187 (Alaska 1977).

**8**

See *Appleman v. Kansas-Nebraska Natural Gas Co.*, 217 F.2d 843, 849 (10th Cir.1954); *Babray v. Carlino*, 2 Ill.App.3d 241, 276 N.E.2d 435, 442 (1971); *Mathis v. Cactus Drilling Corp.*, 430 S.W.2d 78, 82 (Tex.Civ. App.1968).

We conclude that the superior court's holding was correct. We need not address the question of attorney's fees, as the judgment must be reversed. Upon remand, the superior court may consider further the question of attorney's fees.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

MATTHEWS, J., not participating.