216 P.3d 1154 (2009)
David D. BEAL; Jerry L. Coles; Steven E. Nathanson; Michael C. Norman; Raymond E. Gills; and Stephen C. Sitter, Appellants,
v.
David A. McGUIRE; HealthSouth Corporation; Alaska Surgery Center, Inc.; Alaska Surgery Center, Ltd.; Louise Bjornstad; and Lake Otis Professional Center, LLC, Appellees.
No. S-12626.
Supreme Court of Alaska.
September 25, 2009.
*1158 Douglas Pope, Pope & Katcher, Anchorage, for Appellants.
Timothy J. Petumenos, Birch Horton Bittner & Cherot, and Roger F. Holmes, Biss & Holmes, Anchorage, for Appellees.
Before EASTAUGH, CARPENETI, and WINFREE, Justices.

OPINION
EASTAUGH, Justice.

I. INTRODUCTION
Six members of a joint venture sued two other members, primarily claiming breaches of fiduciary duties. The joint venture, most of whose members were Anchorage physicians, owned a medical services condominium on Laurel Street and leased it out for use as an ambulatory surgical center. The plaintiffs claimed in part that the joint venturer defendants and others were liable for moving the surgical center to a building not owned by the joint venture. They claimed that this diminished the income-earning capacity of the condominium because an Alaska statute, AS 18.07.031(c), effectively prevented the plaintiffs from replacing the surgery center on Laurel Street. The superior court granted complete summary judgment for all the defendants. Because we conclude that genuine issues of material fact exist both as to the extent of the fiduciary duty the two joint venturer defendants owed the plaintiffs and as to whether they breached that duty, we reverse in part and remand. We affirm the summary judgment entered for all the other defendants.

II. FACTS AND PROCEEDINGS
This appeal arises out of a lawsuit brought by six members of a joint venture, Advances in Surgical Care, against two other joint venturers and against several other persons *1159 and entities.[1] The plaintiffs were Anchorage physicians David Beal, Jerry Coles, Steven Nathanson, Michael Norman, Raymond Gills, and Stephen Sitter. The two joint venturer defendants were HealthSouth Corporation and Anchorage physician David McGuire; the other defendants were former HealthSouth employee Louise Bjornstad and several business entities.
Ten physicians and one dentist formed Advances in Surgical Care in 1981. The owners of Advances changed over the years. When the lawsuit was filed in 2003, there were nine members; each had an equal ownership interest. The nine were the six plaintiffs, defendants HealthSouth and Dr. McGuire, and one other individual. Dr. McGuire was not one of the original Advances members, but had become a member by July 1982. HealthSouth became a member in the mid-1990s.
The 1981 organizing document was entitled "Joint Venture Agreement," but it also consistently referred to the members as "partners" and to the entity as "the Partnership." The 1981 joint venture agreement defines "Partnership" to mean "joint venture." The members, including Dr. McGuire, executed an amended agreement in 1982. Like the 1981 agreement, the 1982 agreement is entitled "Joint Venture Agreement," but it also consistently refers to the members as "partners" and to the entity as "the Partnership." Unlike the 1981 agreement, the 1982 agreement does not define "Partnership." The record contains no later organizing document for Advances, and the parties refer to none, so we assume the 1982 agreement is the controlling document. It was largely the same as the 1981 agreement; we will discuss differences in the two agreements as necessary.
The parties dispute the nature and legal effect of Advances's business form. We refer to the entity as a "joint venture," per the titles of the two joint venture agreements in the record. Our usage is not meant to imply any legal or factual distinction between the joint venture form and the partnership form. We discuss that issue below. Both agreements stated that the "sole purpose" of Advances was to acquire, develop, and manage property for the "production of income and profit." But it also appears undisputed that, as the defendants alleged in the superior court, the members specifically entered into the joint venture agreement "to construct a building to be used for professional services."
The persons who were the original Advances joint venturers were also the shareholders of a separate corporation, Alaska Surgery Center, Inc., that was then operating an ambulatory surgical center on Rhone Circle in Anchorage; that surgery center had been in operation since approximately 1976. Alaska Surgery Center, Inc. has been known by different names, including "Surgery Center, Inc." and "Surgery Center." We refer to it as "Alaska Surgery Center, Inc.," the name the corporation adopted in 1983, or as "Alaska Surgery Center" for short. The plaintiffs allege here, as did the defendants below, that the joint venturers started the Advances joint venture primarily to construct a new facility that could house a new ambulatory surgery center.
As amended in 1982, AS 18.07.031 required anyone intending to spend $1 million or more on the construction of a health care facility to first obtain a certificate of need (CON) from the Alaska Department of Health and Social Services (DHSS).[2] In about 1982 Advances and Alaska Surgery Center, Inc. jointly applied to DHSS for a CON to construct an *1160 ambulatory surgical center on Laurel Street in Anchorage so Alaska Surgery Center could relocate from Rhone Circle. Dr. Raymond Gills sent DHSS a letter on behalf of Alaska Surgery Center, Inc., stating in part that the space at Rhone Circle would no longer be used for outpatient surgery once that space was vacated.
In February 1983 DHSS issued to both Alaska Surgery Center, Inc. and Advances a CON for the "construction of a new facility and the relocation and expansion of the Surgery Center. . . ." The CON approved a maximum expenditure of $2,809,400 for the new facility. Advances then constructed a new ambulatory surgical facility in Condominium A of 4001 Laurel Street; Advances was the owner of that condominium.
In late 1984 or early 1985 the individuals who were the Alaska Surgery Center, Inc. shareholders (and who were also the Advances joint venturers) sold a majority of their shares in Alaska Surgery Center, Inc. to a health care operating company called AlternaCare.[3] At the same time, the Advances joint venture negotiated a twenty-year lease with Alaska Surgery Center, Inc. for Condominium A at 4001 Laurel Street. In effect, the joint venture leased the space for the surgery center to AlternaCare for twenty years. The joint venturers also entered into a twenty-year non-competition agreement between themselves and AlternaCare that prohibited Advances and the former shareholders of Alaska Surgery Center, Inc. from directly or indirectly engaging in the ambulatory surgery center business "at any location within a 25 mile radius of the current site of the Center or within the Municipality of Anchorage, whichever is smaller." The lease and the non-competition agreement both expired in 2005.
The ownership of Alaska Surgery Center, Inc. changed, and in 1996 HealthSouth acquired a majority interest in the corporation. Around the same time, HealthSouth also acquired an eleven percent interest in the Advances joint venture. Thus, by the mid-nineties, the joint venturers included the six physicians who are plaintiffs here and Dr. McGuire and HealthSouth.
When HealthSouth acquired the corporation in 1996, Alaska Surgery Center, Inc. had approximately nine years remaining on its Laurel Street lease with Advances. In June 1998 HealthSouth hired Dr. McGuire as a consultant to help relocate the Alaska Surgery Center before its lease expired. After plaintiffs filed suit in 2003, Dr. McGuire testified by deposition that he believed that, to relocate the surgery center from Laurel Street, HealthSouth would have to either build a new facility for less than $1 million or apply for a new CON. Because he believed at the time that getting a new CON would be "difficult," Dr. McGuire informed HealthSouth that "the best and most likely successful outcome would be legislative."
Therefore, around 1999, Dr. McGuire and HealthSouth informed the other joint venturers that they intended to lobby the Alaska legislature either to repeal the CON requirement or to raise the CON threshold from $1 million to $7 million. The plaintiffs later asserted in their complaint that they had "no objection" to either of these proposed legislative changes.
In January 2000 a lobbyist hired by Dr. McGuire and HealthSouth worked with legislators to introduce House Bill 297, which proposed requiring CONs only for projects with proposed costs exceeding $7 million. But the proposal to raise the CON threshold met with opposition. By March 2000 the sponsor statement for HB 297 indicated that the bill had been revised to provide "a solution to the immediate problem without raising the $1,000,000 floor." The revised bill proposed allowing a health care facility to relocate to a new site without obtaining a CON as long as there was no increase in the services offered. As revised, HB 297 proposed in part adding this subsection to AS 18.07.031:
(c) Notwithstanding (a) of this section, a person who is lawfully operating a health care facility that is an ambulatory surgical *1161 facility at a site may make an expenditure of any amount in order to relocate the services of that facility to a new site in the same community without obtaining a certificate of need as long as neither the bed capacity nor the number of categories of health services provided at the new site is greater. However, notwithstanding the expenditure threshold in (a) of this section, a person may not use the site from which the health care facility relocated for another health care facility unless authorized under a certificate of need issued by the department.
The legislature enacted the bill as so revised; the governor signed it into law in April 2000.[4] The last sentence of the subsection was deleted when subsection .031(c) was amended in 2004.[5]
In 2001 HealthSouth, relying on the new CON exception created in 2000 by AS 18.07.031(c), relocated Alaska Surgery Center from 4001 Laurel Street to the Lake Otis Professional Center. Dr. McGuire, Louise Bjornstad, and HealthSouth each acquired an ownership interest in Lake Otis Professional Center, LLC, the company that owned the Lake Otis Professional Center. HealthSouth's lease of the Laurel Street facility did not expire until 2005 and HealthSouth apparently continued to pay rent to the Advances joint venture through the end of the lease. The defendants assert that the Laurel Street surgery center space has remained vacant since Advances regained possession when the lease expired in 2005.
Five of the joint venturers sued Dr. McGuire, HealthSouth, Louise Bjornstad, Alaska Surgery Center, Inc., Alaska Surgery Center, Ltd., and Lake Otis Professional Center, LLC in April 2003.[6] Another plaintiff was added later. The six plaintiffs are the appellants in the appellate caption. Their March 2004 amended complaint asserted eight claims: (1) fraud by intentional misrepresentation; (2) fraud by deception; (3) negligent misrepresentation; (4) conversion; (5) conspiracy to commit fraud; (6) breach of fiduciary duty; (7) breach of contract; and (8) economic duress.
The superior court granted complete summary judgment for all the defendants in October 2006. The court concluded in part that the plaintiffs had not demonstrated how "choosing to move rather than extending [the] lease" breached any duty owed by defendants McGuire and HealthSouth. The court then awarded all of the defendants attorney's fees under Alaska Civil Rules 68 and 82.
The plaintiffs appeal.

III. DISCUSSION

A. Standard of Review
We review grants of summary judgment de novo, drawing all factual inferences in favor of, and viewing the facts in the light most favorable to, the non-prevailing party.[7] Summary judgment is appropriate if there is no genuine issue as to any material fact and the prevailing party is entitled to judgment as a matter of law.[8] A party opposing summary judgment need not prove that it will prevail at trial, but only that there is a triable issue of fact.[9] Any evidence sufficient to raise a genuine issue of material fact, "so long as it amounts to more than a scintilla of contrary evidence," is sufficient to oppose summary judgment.[10]
*1162 The applicability of a legal doctrine presents a question of law to which we apply our independent judgment, adopting the rule of law that is most persuasive in light of precedent, reason, and policy.[11] Questions of contract interpretation generally raise questions of law that we review de novo.[12] Fact questions may be created if the meaning of the contract language depends on conflicting extrinsic evidence.[13] Summary judgment is inappropriate if there is an unresolved material factual dispute about the intent of the contracting parties.[14] The parties' expectations must be gleaned not only from the contract language, but also from extrinsic evidence, including evidence of the parties' conduct, goals sought to be accomplished, and surrounding circumstances when the contract was negotiated.[15]
We review a superior court's award of attorney's fees for an abuse of discretion.[16] We will conclude there has been an abuse of discretion if, after reviewing the whole record, we are left with a definite and firm conviction that the superior court erred in its ruling.[17] Whether a superior court applied the law correctly in awarding attorney's fees is a question of law that we review de novo.[18] We apply the independent standard of review in deciding whether a superior court correctly determined a settlement offer's compliance with Rule 68.[19]

B. Whether It Was Error To Grant Summary Judgment to the Joint Venturer Defendants on the Fiduciary Duty Claim
The plaintiffs argue that the superior court erred by granting summary judgment to the two joint venturer defendants (HealthSouth and Dr. McGuire) on the fiduciary duty claim.[20] This claim primarily concerns the joint venturer defendants' role in relocating the surgery center from the Laurel Street facility owned by the joint venture to a facility not owned by the joint venture at a time AS 18.07.031(c) effectively prevented operation of a replacement surgery center at the Laurel Street address. The plaintiffs contend that the joint venture agreement as written imposed fiduciary duties relevant here. They also argue that these genuine issues of material fact exist: (1) whether joint venturers Dr. McGuire and HealthSouth owed the other joint venturers a fiduciary duty; (2) whether Dr. McGuire and HealthSouth breached that duty; and (3) whether the plaintiffs suffered damages as a result.

1. The scope of Dr. McGuire and HealthSouth's fiduciary duties
The plaintiffs contend preliminarily that the joint venture agreement created a fiduciary relationship and that the joint venturers *1163 owed each other a duty to act without fraud or deceit and with full disclosure at all times. They also argue that there are genuine issues of material fact concerning the scope of fiduciary duties owed by Dr. McGuire and HealthSouth. Dr. McGuire and HealthSouth respond that Advances was a joint venture, not a partnership, and assert that this distinction is "significant" because the scope of duties owed between partners is generally broader than that owed between joint venturers.

a. Whether the form of Advances matters
In granting summary judgment, the superior court noted that the parties disagreed about whether partnership or joint venture law determined the scope of fiduciary duties owed. The superior court did not resolve this disagreement, having ruled there was no breach of any fiduciary duty.
Because joint ventures and partnerships both involve fiduciary relationships, the outcome of this appeal does not turn on whether Advances was a partnership or a joint venture.[21] Instead, the scope of any duties the members owed each other is principally determined by the terms of the 1982 joint venture agreement. We assume the 1982 agreement is the applicable agreement. That is the agreement signed by Dr. McGuire, and no one suggests any later joint venture agreement exists or applies.
That said, there seems to be little justification for distinguishing between a partnership and a long-term joint venture like Advances when determining the scope of fiduciary duty owed. Advances was created primarily to construct the 4001 Laurel Street building and to own and manage the portion of the building (Condominium A) containing a surgery center that would generate long-term profits for the joint venturers. Advances is a profit-sharing enterprise formed to facilitate not just a single transaction or project relatively brief in duration, but rather a long-term, and potentially lucrative, business arrangement. Although we have indicated that fiduciary duties owed between partners may often be broader than those owed between joint venturers,[22] we have been referred to no authority that would make such a distinction relevant in this case.[23]
It also does not matter that, unlike the 1981 agreement, the 1982 amended agreement did not explicitly state that general partnership law would apply to the extent the agreement did not provide otherwise. The joint venture was a form of partnership; the only question is whether the agreement's terms and purposes gave rise to or foreclosed particular purported duties of loyalty and care.
Under Alaska's Uniform Partnership Act *1164 (UPA),[24] the scope of duties owed between partners is largely determined by the partnership agreement.[25] The UPA also governs relations between and among partners "[t]o the extent the partnership agreement does not otherwise provide."[26] According to AS 32.06.404, partners owe each other the duties of loyalty and care.[27] The duty of loyalty requires a partner to refrain from competing in the conduct of the partnership business and to account for any property, profit, or benefit derived by the partner from the appropriation of a partnership opportunity.[28] A partner must discharge this duty and any other duties under the partnership agreement and exercise any rights "in accordance with the obligation of good faith and fair dealing."[29] According to AS 32.06.960, the partnership agreement may not completely eliminate the duty of loyalty, but may "identify specific types or categories of activities that do not violate the duty of loyalty, if not manifestly unreasonable."[30]
To determine the scope of duties owed between the Advances joint venturers, we must therefore first consider what duties the joint venture agreement explicitly or implicitly imposed on the members.

b. The terms of the agreement
The parties disagree about the extent of any fiduciary duty owed under the 1982 joint venture agreement. Four provisions in that agreement, sections 2.04, 2.05, 5.04, and 13.07, are particularly relevant.
The defendants argue that sections 2.05 and 13.07 demonstrate that the joint venturers specifically agreed to limit their fiduciary duties, as former AS 32.05.130 legally entitled them to do.[31] The defendants appear to reason that sections 2.05 and 13.07 entitled Dr. McGuire and HealthSouth to deal with the plaintiffs "at arm's length, unencumbered by any fiduciary duty," in any matter involving Alaska Surgery Center, Inc. after its sale in 1985.
Section 2.05, in effect, permitted members to compete with the joint venture and among themselves, and states that nothing "shall deprive or otherwise affect the right of the Partners to own, invest in, manage or operate property or to conduct business activities which are competitive with the business of the Partnership."
Section 13.07 authorized the individual joint venturers to enter into transactions with Advances, and provides:

Transactions Between the Partnership and a Partner. Any Partner may deal with the Partnership other than in his capacity as a member of such Partnership, and any such transaction shall be considered *1165 as occurring between the Partnership and one who is not a Partner. Any such transaction(s) shall be governed by such terms and conditions and shall be based on such compensation and commissions as may be agreed between the Partner so dealing with the Partnership acting through the Executive Committee.
The plaintiffs implicitly contend that section 13.07 was intended to permit a joint venturer to deal at arm's length with Advances when leasing office space in the Laurel Street facility.[32] They also argue that nothing in section 2.05, which permits members to compete with Advances and the other members, implies a complete waiver of all fiduciary duties.
We conclude that the defendants' analysis of the agreement's limiting effect on fiduciary duty is incorrect. They correctly contend that sections 2.05 and 13.07 allow joint venturers to compete with Advances and conduct business with Advances as if they were at arm's length. But those provisions did not expressly or implicitly relieve Dr. McGuire and HealthSouth of every fiduciary obligation they might otherwise owe with respect to the ownership and management of the joint venture's Laurel Street property. Indeed, to the extent the fiduciary violations alleged by the plaintiffs do not involve either competing with or dealing at arm's length with the joint venture, sections 2.05 and 13.07 do not apply.
The plaintiffs contend that section 5.04 of the joint venture agreement confirms that the members of Advances owed a fiduciary duty to act "without fraud and deceit and with full disclosure at all times." They also argue that section 5.04 prohibited the joint venturers from doing anything that would effectively prevent Advances from carrying on its "business," which they assert was "to lease a majority of the space at the Laurel Street facility [for use] as a surgery center."
Section 5.04, in effect, prohibits members from engaging in unconsented activities detrimental to the joint venture's best interests. It states in part that a member cannot, "without the consent of the Majority-in-Interest of the Partners," do any act that would be "detrimental to the best interests of the Partnership" or otherwise "make it impossible to carry on the business of the Partnership."[33]
The superior court implicitly determined that section 2.04 defined the extent of Advances's purpose and, by extension, the extent of any fiduciary duty owed under section 5.04. The superior court concluded that, per section 2.04, the purpose of Advances was "specifically limited to the acquisition of real property and the development, leasing, sale, operation and management of the real property." The court seemingly reasoned that the business of the joint venture was not leasing a surgery center, but rather generally owning and managing real property.
Section 2.04, which defines the purpose and character of the Advances business, provides that:

*1166 [t]he sole purpose of the Partnership shall be limited to (i) the acquisition of real property listed in Exhibit A hereof ("Property") and all personal property used in connection with the operation of the Property and improvements thereof; and (ii) the development, leasing, sale, operation and management of the Property, improvements thereon, and said personal property for the production of income and profit.[[34]]
In short, section 2.04 states that the "sole purpose" of the joint venture is to manage real property for "the production of income and profit." Defendants point to no evidence permitting a finding that there was no such purpose. Given this express purpose, we conclude that section 5.04 imposed a fiduciary duty on the joint venturers to avoid gravely harming the income-earning capacity of the joint venture. That duty was potentially relevant here. We consequently conclude the agreement's terms imposed actionable fiduciary duties on the members, without regard to whether extrinsic evidence would permit defining those duties more broadly.
The plaintiffs also argue that the superior court "erred by limiting [its] review to the terms of the partnership agreement." They contend that the court also should have considered extrinsic evidence and the circumstances surrounding the formation and conduct of the partnership. The plaintiffs argue that the court should have considered that: (1) when Advances was formed, the joint venturers were all practicing physicians who owned and operated Alaska Surgery Center, Inc.; (2) Advances applied for the 1983 CON together with Alaska Surgery Center, Inc.; and (3) Advances's primary business for twenty years was leasing out most of the Laurel Street facility for use as a surgery center.
We agree with the plaintiffs that the text of the joint venture agreement is not necessarily dispositive when determining the purpose of the joint venture. As the plaintiffs argue, in determining the meaning of an agreement courts should consider, in addition to its text, relevant extrinsic evidence, including the subsequent conduct of the parties.[35] Courts may consult extrinsic evidence without first finding that an agreement's words are ambiguous.[36]
We conclude that the record contains evidence that would permit an inference that the purpose of the joint venture was broader than the superior court found from the agreement's text. For example, the joint venture was formed by a group of health care professionals who then owned and operated the Rhone Circle surgery center. After Advances acquired the Laurel Street property, the joint venture and a new corporation jointly applied to DHSS for a CON to construct a new, apparently larger, health care facility on Laurel Street into which the Alaska Surgery Center would be moved. The joint venture received the surgery center lease payments for at least twenty years. And although the surgery center itself was sold in 1985, it was sold when no statute permitted the surgery center to be relocated unless a new CON was obtained for the new location. A fact finder might therefore find that even though the current lease expired in 2005, given the relative difficulty of obtaining a CON, it was reasonable for the joint venture to expect that the Laurel Street facility would continue to operate as a surgery center beyond 2005 and would continue to generate commensurate lease payments. It cannot be said as a matter of law that the joint venture had no purpose of receiving those payments after 2005 just because the current lease was to expire in 2005. It could be inferred that Advances was formed not merely to manage real property at 4001 Laurel Street, but with the specific purpose of (1) *1167 providing space to be leased for long-term use as the new (post-Rhone Circle) ambulatory surgical center and (2) sharing substantial profits from that use. The evidence suggests that the joint venture had a purpose of leasing real estate for use as a surgery center, or at least owning a facility that would generate the sort of revenue to be earned by leasing to a surgery center.
Therefore, even given a narrow reading of what the agreement said about the purpose of Advances, it cannot be said as a matter of law that the joint venture had no purpose giving rise to a fiduciary duty relevant here. And extrinsic evidence that the purposes may have specifically included leasing the space for use as a surgery center creates a genuine fact dispute that forecloses complete summary judgment on the duty issue. It will be necessary on remand to consider extrinsic evidence relevant to the joint venture's purposes. Those purposes will determine what the joint venturer defendants could permissibly do (such as competing, as expressly authorized by section 2.05) and could not do (such as any act that was detrimental to the joint venture or that made it impossible for the joint venture to carry out its business, as expressly prohibited by section 5.04).

2. The alleged breaches of fiduciary duties

a. Relocation of the surgery center
The plaintiffs argue that the superior court erred in granting summary judgment on the issue whether the two joint venturer defendants breached their fiduciary duties. The plaintiffs contend in part that there are triable issues whether those defendants breached their fiduciary duties by "destroying [the joint venture's] right to continue leasing the Laurel Street facility as a competing surgery center."
Whether there was a breach depends in part on what duties were owed. Given what we said above about those duties, there is a genuine issue of material fact about whether Dr. McGuire and HealthSouth breached their fiduciary duties when they moved the surgery center from Laurel Street to Lake Otis. If Advances had a purpose of maximizing the rent at Laurel Street or a more specific purpose of receiving rent from a surgery center into the indefinite future, there is a genuine dispute about whether the conduct of the joint venturer defendants breached their fiduciary duties by violating section 5.04.
We are unpersuaded that either section 2.05 or section 13.07 has any application to the relocation dispute. Section 2.05 would have permitted the defendants to open a brand new surgery center in competition with the existing surgery center; doing so therefore could not, by itself, have been a breach of fiduciary duty. But the relocation was not an act of competition, and indeed effectively prevented the joint venture from competing with the relocated surgery center. Relocation prevented the joint venture from replacing the surgery center at the Laurel Street facility, because AS 18.07.031(c), even as amended in 2004, prohibited Advances from establishing a surgery center there unless it either obtained a new CON or spent less than $1 million on the replacement center.[37]
The evidence permits an inference that neither of those options was feasible. There was evidence the Alaska Surgery Center operated six surgical suites at the Laurel Street facility before it relocated. And there was evidence that although the joint venture might be able to re-equip and reopen a two-suite surgery center for under $1 million, there was "no way that [it] could get six rooms, even buying used equipment. . . ." There was also evidence suggesting that DHSS was unlikely to issue Advances a CON to reestablish a surgery center at Laurel Street. Dr. Nathanson stated in a 2006 affidavit that Advances was "being told that it is not likely another CON will be issued in the near future for an ambulatory surgery center in the Anchorage area."
*1168 It is also inferable that the defendants knew before the relocation that it would be difficult to obtain a new CON for a surgery center in Anchorage: Dr. McGuire recommended in the late 1990s that HealthSouth pursue legislative changes that would enable the Alaska Surgery Center to relocate without being issued a new CON. Dr. McGuire testified in his deposition that he believed getting a CON for the construction of a new surgery center would be "difficult" and that legislative action presented HealthSouth's "best and most likely successful outcome."
We therefore conclude that there is a triable issue as to whether Dr. McGuire and HealthSouth breached their fiduciary duties by relocating Alaska Surgery Center in 2001.
There may also be a triable issue about whether the joint venturers consented to the relocation. The defendants argue that the plaintiffs "expressed agreement" with HealthSouth's plan to seek legislation that would exempt it from obtaining a CON before moving the surgery center. We interpret section 5.04 to mean that, if a majority-in-interest of the joint venturers consented to relocating the Alaska Surgery Center, the relocation would have breached no fiduciary duty.[38]
The superior court concluded that the plaintiffs "admitted that they approved the move."
The plaintiffs' amended complaint stated that they did not object to defendants' plans to build a new ambulatory surgical facility and to seek changes in the CON law. But that admission is inferably qualified by the amended complaint's related allegation that the plaintiffs then understood that the defendants were seeking to repeal the CON law or raise the CON threshold. Neither of those changes would have prevented the joint venture from recreating a surgery center after the relocation proposed by the defendants. The plaintiffs did not admit that they had consented, after AS 18.07.031 was amended in 2000, to a relocation that would effectively prevent Advances from using or leasing the Laurel Street property as a surgery center after the proposed relocation.
The plaintiffs argue that consent must be informed to be meaningful in these contexts. They cite in support the Oregon Supreme Court's decision in Starr v. International Realty, Ltd.[39] In that case, partners in a real estate venture sued their fellow partner to account for commissions he had received by acting as a realtor without their consent.[40] The Oregon Supreme Court concluded that the consent required of the other partners was "informed consent with knowledge of the facts necessary to the giving of an intelligent consent."[41]
We adopted the Starr consent standard in Wirum & Cash, Architects v. Cash.[42] We held there that "[a] partner only overcomes a breach of fiduciary duty if there is a full and complete disclosure to the other partner and if the breaching partner secures the other partner's approval and consent."[43] We also concluded that the consent "must be informed consent with knowledge of facts necessary *1169 to an intelligent choice."[44] That standard applies here.
We accordingly conclude that a genuine issue of material fact remains as to whether a majority-in-interest of the joint venture consented to the relocation of Alaska Surgery Center. It cannot be said as a matter of law that consent expressed before the plaintiffs knew of the revisions to HB 297 was "informed."

b. Misrepresentation
The plaintiffs argue that Dr. McGuire and HealthSouth also breached their fiduciary duties by making misrepresentations to David Pierce, the CON coordinator for DHSS, about the joint venture's intentions. The superior court appears to have dismissed the misrepresentation, deception, and conversion claims because it had concluded plaintiffs had no property interest in the CON or claim arising out of the "transfer" of the CON. What we say elsewhere in this opinion in subpart a above and subpart c below about the relocation and partnership property theories of fiduciary duty breach also requires remand for consideration of the misrepresentation theory.
Soon after HB 297 became law, Pierce sent an e-mail to a HealthSouth representative congratulating HealthSouth on the bill's passage and instructing HealthSouth on how to "expedite the process for receiving a health care facility construction license." Pierce asked HealthSouth to submit a letter of intent "provid[ing] a list of owners of the existing facility and their signatures showing that they agree to close the existing facility once the new facility is built."
Louise Bjornstad responded for HealthSouth with a letter of intent addressing Pierce's questions regarding Alaska Surgery Center's relocation. Bjornstad did not list the names of the Advances joint venturers or provide their signatures as Pierce had requested. Although HealthSouth prepared a draft signature page for the Advances joint venturers, the page was never signed. Dr. Beal stated in his deposition that he had never seen the page before.
Bjornstad stated in her letter to Pierce that "[t]he Laurel Street Building will [not be] leased or sold to any individual or group intending to operate an ambulatory surgery center." She further addressed Pierce's request regarding the future business of the Laurel Street facility in the following way:
[AS 18.07.031(c)] clearly does not require that the Laurel Street Building remain vacant after the Surgery Center relocates. Therefore, we do not understand how the purpose of the statute would be served by the agreement by the owners of the Laurel Street Building that the[y] will "close the existing facility." Nothing in AS 18.07.031 prohibits new uses of the Laurel Street Building that do not require a certificate of need, including health care related uses.
Dr. McGuire then sent an email to Pierce expressing frustration about the CON determination process. Seemingly referring to Pierce's recent request for a letter of intent from HealthSouth, Dr. McGuire remarked, "[w]hy you would suppose that you had the authority to demand that the exi[]sting facility be `CLOSED' or that the owners of the facil[i]ty should sign a document to that effect is beyond me!! You have caused expenditures for attorneys fees that should never have been required." Dr. McGuire further commented that Pierce's recent "demands" of HealthSouth were "vindictive and prejudicial" in light of clear legislative intent that replacement projects "be allowed to proceed without interference from [Pierce's] department."
The plaintiffs argue that HealthSouth and Dr. McGuire breached their fiduciary duty when they "resisted providing" Pierce the information he requested regarding the intentions of Advances and "misrepresented" that the joint venturers intended to use the Laurel Street building in a way that would not require a CON. The plaintiffs also contend *1170 that Dr. McGuire and HealthSouth breached their fiduciary duties by concealing: (1) the effect of the 2000 amendment, (2) their role in the legislative process, and (3) the misrepresentations they made to Pierce after the legislation passed.
The defendants respond that there was nothing wrong with HealthSouth's representations to Pierce. But we conclude that a fact finder could disagree. There appears to be a factual dispute about whether the joint venture had no interest in using the Laurel Street building for a surgery center, a use that would require a CON, and thus either the existing 1983 CON or a new CON. Bjornstad's statement was therefore potentially incorrect. The defendants' communications with Pierce permit an inference that they deliberately avoided involving the plaintiffs in their CON approval process and actively discouraged DHSS from contacting the other members of the joint venture. Based on the plaintiffs' present objections, had Pierce contacted the other members, it is possible they would have stated that they intended to continue renting or even intended to begin operating the Laurel Street facility as a surgery center themselves and would have objected to the relocation proposed by Health South. It is also conceivable that news of such an intent or such an objection would have affected Pierce's determination. That Pierce asked for the signatures of the Advances joint venturers is some evidence he believed their consent was relevant to the process. We therefore conclude that a genuine issue of material fact exists as to whether Dr. McGuire and HealthSouth's conduct amounted to a breach of their fiduciary duties.
The defendants also contend, but very tersely, that Bjornstad's statements were "constitutionally and legislatively protected" under both the First Amendment and the Noerr-Pennington doctrine.[45] The plaintiffs argue that Noerr-Pennington only insulates an individual's petitioning activity from statutory-based liability and "does not extend to immunity to the breach of contract and breach of fiduciary duty claims in this case."
The Noerr-Pennington doctrine evolved out of two United States Supreme Court cases: Eastern R.R. Presidents Conference v. Noerr Motor Freight, Inc.[46] and United Mine Workers v. Pennington.[47] The Court held in Noerr that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly."[48] At least one court has expanded the doctrine to insulate First Amendment petitioning activity from any cause of action other than defamation.[49]
The superior court did not rule that the defendants' communications with Pierce were protected by the petition clause. There may be unresolved factual disputes material to any invocation of the petition clause regarding those communications. There may be questions about whether any immunity has been lost.[50] There may also be significant *1171 legal questions about whether the right to petition is consistent with imposing liability for concealing the petitioning activity and any alleged misrepresentations from a person to whom a fiduciary duty is owed. And the scope of the Noerr-Pennington doctrine is in substantial legal dispute. We therefore decline to resolve this unripe and under-briefed issue.

c. Misuse of partnership property
The plaintiffs argue that Dr. McGuire and HealthSouth breached fiduciary duties by using partnership property without consent. They allege that Advances acquired a valuable property interest in the 1983 CON that the defendants then used to relocate Alaska Surgery Center.
The superior court's summary judgment order rejected all arguments premised on an assertion the CON was itself property or conveyed any property right. The court concluded that the CON was issued specifically for constructing, not operating, the Laurel Street facility. It accordingly concluded that the CON had "ceased being a valid property interest" when it "expired" on February 15, 1985.
Arguing that the superior court erred in reaching this conclusion, plaintiffs contend that the CON did not expire post-construction because it conferred the right to use the facility as a surgery center indefinitely, as long as the recipient complied with the CON's terms. A contrary interpretation, they argue, (1) would "render meaningless" the provisions of AS 18.07.081 that provide guidelines for when a CON may be revoked due to the sponsor's non-compliance with its terms,[51] and (2) would be inconsistent with the 1976 legislative mandate requiring all health care facilities in existence or under construction before July 1, 1976 to be issued a CON.[52]
The defendants respond that the CON is not a property right but rather a means of tracking medical services available within a community. They argue that, even if the CON is a property right, the right attaches, not to a building, but to the health care business that operates within it. They contend that the CON in this case was always owned by Alaska Surgery Center, Inc. and that any property right created by the issuance of the CON belonged to Alaska Surgery Center, Inc., not Advances.
These arguments raise these issues: (1) whether issuing a CON vests its sponsor with a property right that continues to exist post-construction; (2) whether the joint venture had any property interest in the operating rights granted by the 1983 CON; and (3) whether any such property interest still belonged to Advances when the Alaska Surgery Center relocated in 2001. These issues are presented even if the CON itself is deemed to have expired when construction was completed.
Per AS 32.06.204, property acquired in the name of the partnership is partnership property. *1172 "Property" is defined in AS 32.06.995(13) to include "real, personal, mixed, tangible, or intangible property, or an interest in property." (Emphasis added.) Other jurisdictions have considered whether a CON confers on its sponsor a property interest for due process purposes and have held that it does. The Iowa Supreme Court has acknowledged that "the actual issuance of a certificate of need conveys a property interest on the holder of the certificate."[53] The Michigan Court of Appeals similarly held that, once granted, a CON conveys a property interest on its holder.[54] That court specifically recognized that a certificate of need for future hospital beds is "a very valuable property interest, often worth millions of dollars."[55]
At least one jurisdiction has held that the right conferred by a CON is limited to the period of construction. The Washington Court of Appeals held in Watkins v. Restorative Care Center that a CON did not entitle the recipient nursing home to continuously maintain 250 beds at the facility.[56] That court held that the CON "merely conferred the right to expand the Center into a 250-bed nursing home facility, a right which expired. . . when construction of the Center's new building was completed."[57]
We have recognized that the public need for medical facilities makes it essential that DHSS be able to regulate health care facilities by way of the CON program.[58] The legislature adopted the CON program to avoid unnecessary duplication of health care resources in any one geographical area.[59] We have recognized that granting a CON creates "a type of health care monopoly" in the recipient medical facility.[60] A CON recipient is authorized to perform a category of health services for an indefinite period of time as long as the recipient complies with the terms of the CON. Per AS 18.07.041, subsequent CONs authorizing the operation of competing facilities will only be issued if DHSS determines that the "availability and quality of existing health care resources or the accessibility to those resources is less than the current or projected requirement for health services required to maintain the good health of citizens of this state."
Given the difficulty of obtaining a CON, any enterprise to which one is issued possesses a potentially valuable asset.[61] The authority a CON confers is valuable because it assumes the state will comply with the statutory scheme and restrict competition. A CON confers the valuable right of complete or partial exclusivity. It gives recipients a de facto monopoly until DHSS decides to issue a CON to a competitor or until a competitor can construct a facility at a cost that does not require it to obtain a CON. *1173 The valuable right extends past the period of construction and continues as long as the recipient complies with the terms of the CON.
We also think it significant that, when it first enacted the CON program in 1976, the legislature required all pre-existing health care facilities, whether they were under construction or not, to apply for a CON.[62] This requirement implies that a CON has importance that extends past the completion of construction. It is also significant that AS 18.07.081 provides that a CON can be revoked if the sponsor fails to provide the services authorized.[63] This provision suggests the CON has some continuing effect even after construction has been completed. If, as the superior court concluded, the issuance of the CON were unnecessary for a facility's operation, post-construction revocation of the CON would have no effect on the facility's continued ability to operate and therefore no deterrent or remedial effect. We do not think this statutory interpretation is consistent with legislative intent.
We accordingly hold that the issuance of a CON creates a valuable property interest in the recipient and that the exclusive authority created by the CON continues to exist post-construction. The issuance of the CON in this case created valuable rights that did not expire just because the construction conditions were satisfied. To the extent the superior court apparently reasoned that no such rights survived the completion of construction, we disagree.
We additionally hold that it was error to conclude as a matter of law that the CON "expired on February 15, 1985." Deposition testimony of David Pierce, quoted in the plaintiffs' superior court motion papers, might permit a finding that he understood that if HealthSouth (or AlternaCare) had abandoned Condominium A before the enactment of the 2000 amendments, Advances could have operated a surgery center at Laurel Street without obtaining a new CON. Pierce's testimony permits an inference that DHSS itself did not consider this CON to have expired. It implies that it was DHSS's view that the issuance of the CON for the Laurel Street facility gave the owners of that facility some continuing rights even if the designated operator quit or went out of business. The statutes then in effect did not expressly provide that a CON expires when construction is completed, and permit a conclusion to the contrary.[64] More importantly, even if the CON itself expired when construction ended, the operating authority implicit in the issuance of the CON must be distinguished at this stage of this case from the constructional authority expressly granted by the CON. There is no basis for thinking that this operating authority expired when construction was completed. After all, the CON statute has a purpose of preventing unwarranted competition, i.e., operation of more facilities than are needed.
We next consider whether Advances had some property interest in the operating rights granted by the 1983 CON, and whether any such property interest still belonged to Advances by the time the Alaska Surgery Center relocated in 2001.
Advances and Alaska Surgery Center, Inc. applied together for the 1983 CON that authorized the construction and operation of the Laurel Street facility. The defendants do not dispute that the 1983 CON "carried both Advance[s] and [Alaska Surgery Center, Inc.'s] names." The CON stated that "it has been determined that the Surgery Center, Inc." had met the requirements. The CON itself named both applicants, without identifying them as recipients or applicants.
When the CON was issued in 1983, the same individual medical professionals owned both Advances (as joint venturers) and Surgery Center, Inc. (as shareholders). Those individuals sold their interest in the corporation, the entity operating the surgery center, *1174 in late 1984 or early 1985 to AlternaCare; HealthSouth ultimately acquired their interest. The documents selling the center to AlternaCare did not mention sale or transfer of the CON to AlternaCare, although they otherwise listed everything AlternaCare was receiving, including the actual license to operate the surgery center and the equipment needed to run the center.
Nor did the sale of the shares and the license to operate include Condominium A, the specific location for which the CON was apparently sought and issued. When the sale to AlternaCare took place, no statute authorized relocation of a facility that required a CON. The relocation statute was not enacted until 2000, some fifteen years later. We think the record demonstrates that there is a genuine issue about whether the issuance of the CON in 1983 gave Advances some continuing property interest in the continued operation of the surgery center at Laurel Street even after the 1985 sale to AlternaCare. If Advances retained such an interest, any unconsented acts of the joint venturer defendants in moving the center away from Laurel Street potentially interfered with or misused joint venture property rights. It was therefore error to grant summary judgment for defendants on plaintiffs' misuse-of-property claim.
We do not mean to imply that there is no dispute about these propositions. Even though the stock sale agreement does not explicitly mention that the authority granted under the 1983 CON was being transferred to AlternaCare (HealthSouth's predecessor-in-interest), it is arguable that the shareholders intended to relinquish any inchoate authority granted them by the issuance of the 1983 CON to continue to operate the Alaska Surgery Center. The sales agreement does not seem to explicitly retain in the shareholders any reversionary right in that operation. But for purposes of this appeal, it is enough to note that there are unresolved factual disputes that preclude summary judgment on plaintiffs' misuse-of-property claim.

d. The plaintiffs' other arguments
The plaintiffs also argue that there are triable issues about whether Dr. McGuire and HealthSouth breached their fiduciary duties in other ways. The plaintiffs allege fraud, deceit, failure to disclose, concealment, bad faith, and profiting from a prohibited transaction connected with the conduct of the partnership. Because the plaintiffs give only cursory treatment to many of these claims, it is unclear whether they add anything to plaintiffs' fiduciary breach claim. But because we are reversing and remanding as to that claim, the plaintiffs may also pursue these subsidiary claims insofar as they relate to the breach of fiduciary duty claim.

3. Liability of the Other Defendants
The plaintiffs argue that there is substantial evidence in the record from which to infer that the remaining defendants  Bjornstad, Alaska Surgery Center, Alaska Surgery Center, Ltd., and Lake Otis Professional, LLC  were liable for "aiding and abetting" a breach of fiduciary duty because they knowingly assisted the joint venturer defendants in breaching their fiduciary duties. The plaintiffs cite Wirum & Cash, Architects v. Cash as standing for the proposition that a person who knowingly assists someone in breaching a fiduciary duty is liable for the harm caused.[65]
We assume for discussion's sake that a non-fiduciary may be liable for aiding or abetting a breach of fiduciary duty. We have stated that, under subsection 876(b) of the Restatement (Second) of Torts, aiding and abetting liability occurs when the actor "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other."[66]
*1175 But plaintiffs have waived this argument. The amended complaint did not claim aiding and abetting fiduciary breach. Nor did the plaintiffs raise their aiding-and-abetting theory in the superior court.
Moreover, the plaintiffs produced no facts demonstrating that defendants Alaska Surgery Center, Inc., Alaska Surgery Center, Ltd., and Lake Otis Professional, LLC gave "substantial assistance or encouragement" in any way that aided Dr. McGuire and HealthSouth's alleged breaches.
We are also unpersuaded by the plaintiffs' argument as to Bjornstad's liability. As a general principle an employee "cannot be held liable for the breach of a contract between the employer and another party."[67] An employee likewise may not be held liable for his or her employer's breach of fiduciary duty with respect to a third party. Although an employee such as Bjornstad "may be held liable for damage caused by independently tortious or malicious acts,"[68] there is no claim on appeal she engaged in such acts.
We accordingly hold that the superior court did not err in granting complete summary judgment for Bjornstad, Alaska Surgery Center, Inc., Alaska Surgery Center, Ltd., and Lake Otis Professional, LLC on all claims.

4. Whether it was error to find that there were no damages
The superior court dismissed most of the claims partly because it concluded that there were no damages. It appears to have concluded that the only possible harm posed to Advances originated from the language in the 2000 statutory amendment providing that, "notwithstanding the expenditure threshold in (a) of this section, a person may not use the site from which the health care facility relocated for another health care facility unless authorized under a certificate of need issued by the department."[69] Because the legislature deleted this language when it amended subsection .031(c) in 2004, the superior court may have reasoned that the joint venture was thereafter in the same position it would have been in before enactment of the 2000 amendment.[70] The court found that HealthSouth continued to pay the rent on the Laurel Street facility until its lease expired in 2005 and that the joint venture was thereafter free to do what it wanted with the property.
The plaintiffs argue that they suffered damages because Advances is no longer able to lease out the Laurel Street facility as a surgery center or sell it to someone intending to operate it as a surgery center. They contend that this lost ability has "substantially reduced" the joint venture's income from the property because Advances could otherwise have leased the building at above-market rates.
The defendants respond that the joint venture's inability to use the Laurel Street facility as a surgery center "has nothing to do with [HealthSouth] and Dr. McGuire and everything to do with the business decision [the plaintiffs] made to cash out by selling the surgery center in 1985." They contend that the Laurel Street facility has remained vacant since Advances regained possession in 2005 because "it will now cost more than the CON threshold limit to start up another surgery center in the vacated space." Defendants also note that the lease expired in 2005 and that all lease payments were made. *1176 They therefore contend that Advances suffered no damages and that Advances is in the same position it would have been had HealthSouth simply shut down the facility in 2005 or waited until 2005 to relocate.
We conclude that there is a genuine factual question about whether Advances has been damaged. The 2004 amendment to AS 18.07.031(c) does not establish as a matter of law that Advances was not damaged. Even as amended in 2004, the statute did not allow Advances to construct a surgery center at Laurel Street without obtaining a new CON unless the cost would not have exceeded $1 million. The evidence permits an inference that neither alternative was feasible. Moreover, the defendants appear to concede that Advances is no longer able to house a surgical center in the Laurel Street facility.
We concluded above that there is a material question of fact about whether the joint venturer defendants breached their fiduciary duties by relocating the Alaska Surgery Center from the Laurel Street facility after AS 18.07.031 was amended in 2000. We similarly hold that there is a triable issue about whether the plaintiffs were damaged as a result of the relocation.

C. Attorney's Fees
The plaintiffs argue that the superior court erred in awarding the defendants Civil Rule 68 and Civil Rule 82 attorney's fees.
When the plaintiffs filed their original complaint in April 2003, they were represented by the law firm of Landye Bennett Blumstein LLP (LBB). In October 2003 the defendants moved to disqualify LBB from representing the plaintiffs because it had drafted the joint venture agreement for Advances, provided guidance to Defendant McGuire about a CON's legal characteristics, and advised Advances about the dispute between Drs. Beal and McGuire. The superior court granted the disqualification motion on November 13, 2003, concluding that LBB had "engaged in the prohibited conduct of both representing and bringing suit against a client."
Before LBB was disqualified, defendants HealthSouth, Bjornstad, Alaska Surgery Center, Inc., Alaska Surgery Center, Ltd., and Lake Otis Professional Center, Inc. each made an offer of judgment to each plaintiff. Dr. McGuire made an offer of judgment to each plaintiff except Dr. Gills. Most of the offers were made in June 2003, about two months after the plaintiffs filed their first complaint. Each offer provided that:
Defendant . . ., pursuant to Alaska R. Civ. P. 68 and AS 09.30.065, hereby offers to allow entry of judgment for plaintiff . . . in this action for $1.00, including interest, costs and attorney's fees. This is an offer of compromise only and is not to be construed as an admission.
No plaintiff accepted these offers.
After granting complete summary judgment for the defendants, the superior court awarded them attorney's fees under both Rule 68 and Rule 82. Under Rule 82, it awarded defendants full reasonable attorney's fees that the defendants incurred from the commencement of the litigation until LBB was disqualified on November 13, 2003. Under Rule 68, the court also determined that each plaintiff, with one exception, was liable for seventy-five percent of the full reasonable attorney's fees each defendant incurred after November 13, 2003.[71]

1. The awards to HealthSouth and Dr. McGuire
Because we have reversed the grant of complete summary judgment for defendants Dr. McGuire and HealthSouth and remanded for further proceedings as to them, they are no longer prevailing parties. We accordingly vacate their Rule 68 and Rule 82 attorney's fees awards.

*1177 2. Whether it was error to award both Rule 68 and Rule 82 fees
The plaintiffs argue that the superior court erred by awarding attorney's fees under both Rule 68 and Rule 82.
Alaska Statute 09.30.065, which codifies when Rule 68 awards may be granted, states that "[a] party who receives attorney fees under this section may not also receive attorney fees under the Alaska Rules of Civil Procedure." A party may not receive awards under both Rule 68 and Rule 82 even if those awards correspond to different time periods within the same case.[72]
Because it was error to award the defendants fees under both Rule 68 and Rule 82 in the same case, we vacate the fees awards to the prevailing party defendants and remand for further proceedings.[73]

3. Whether the Rule 68 offers of judgment were valid
The plaintiffs argue that we should reverse the Rule 68 awards because the offers of judgment were invalid. They contend in part that the offers were unreasonable in both timing and amount because the defendants made one dollar offers of judgment thirty days after the litigation started as a "tactical move to benefit from the 75% clause in the rule and the statute." They also argue that the offers did not refer to resolution of the counterclaims brought by HealthSouth and Dr. McGuire and "thus did not `clearly indicate' that `all claims between the parties would be resolved if the offer were accepted.'" The defendants respond that the offers explicitly offered "to allow entry of judgment for plaintiff" and therefore clearly indicated that, if they were accepted, all claims would be resolved in the plaintiffs' favor.
Rule 68 provides for attorney's fees awards when a prevailing litigant has offered to allow judgment to be entered in "complete satisfaction of the claim."[74] If the case involves multiple defendants and the judgment finally rendered is at least ten percent less favorable to the offeree than the offer of judgment, the prevailing litigant is entitled to Rule 68 fees.[75] A prevailing party serving a successful offer of judgment within sixty days after the date set for initial Rule 26 disclosures is entitled to recover seventy-five percent of his or her reasonable actual attorney's fees.[76]
Other courts have held that to obtain the protection and benefit of enhanced attorney's fees, the offer of judgment must be made in good faith with the goal of settling the case rather than obtaining a larger attorney's fee award.[77] Those courts have suggested that, as a general rule, one dollar offers of judgment do not satisfy that good-faith test.[78]
*1178 Although we have yet to adopt a similar "good-faith test" for offers of judgment, we suggested in Lowell v. Hayes that a Rule 68 offer of judgment may be invalid if the offer is disingenuously low.[79] We there observed that in Beattie v. Thomas, the Nevada Supreme Court had identified four factors for trial courts to consider in determining the validity of offers of judgment.[80] One of those factors was whether the offer was reasonable and in good faith in both its timing and amount.[81] But because the plaintiff in Lowell did not claim the defendants' offer was unreasonable or made in bad faith, we did not need to reach the issue in that case.[82]
The superior court here declined to apply the Lowell dicta, concluding that "the language of Rule 68 and A.S. 09.30.065 and the purposes of the rule and statute is best served by a bright line rule rather than a determination under the Beattie factors."
Even though a purpose of Rule 68 is to encourage settlement and avoid protracted litigation, offers of judgment made without any chance or expectation of eliciting acceptance or negotiation do not accomplish the purposes behind the rule. The offers of judgment in this case were for one dollar. Most of the defendants served their individual offers of judgment before they asserted their counterclaims.[83] Their offers were nothing more than tactical demands that plaintiffs dismiss their claims to avoid exposure to Rule 68 fees awards. The amount offered was effectively zero in what appears to be a good faith dispute involving potentially substantial damages. In the context of this case, these offers could not be considered valid offers of settlement or compromise, or valid attempts to encourage negotiation. They do not satisfy the Beattie factors.[84] We conclude that they were not valid Rule 68 offers of judgment, and therefore reverse the Rule 68 fees awards.
We have held that Rule 68 implicitly requires that an offer of judgment include all claims between the parties and "be capable of completely resolving the case by way of a final judgment if accepted."[85] The plaintiffs also argue that because the offers did not explicitly indicate that the counterclaims would be resolved if the offers were accepted, the offers of judgment were not "comprehensive."[86] We do not need to reach this argument, having decided that the offers were invalid for other reasons.
Because the offers of judgment were invalid, we reverse the Rule 68 attorney's fees awards.

4. Whether it was error to award enhanced Rule 82 attorney's fees for the period before LBB was disqualified
The plaintiffs allege that it was unreasonable to award all defendants full reasonable *1179 attorney's fees incurred before LBB was disqualified. The defendants respond that the plaintiffs' persistent attempt to use the joint venture's counsel to sue the defendants was "per se vexatious, unreasonable, in bad faith and utterly devoid of merit," and therefore mandated an enhanced attorney fee award. (Internal quotations omitted.)
An award of full attorney's fees under Rule 82 can be justified by the losing party's bad faith defense or vexatious conduct.[87] The reasons for awarding full attorney's fees "must generally be explained" by the superior court.[88]
In holding the plaintiffs liable for the full attorney's fees incurred by the defendants until LBB's disqualification, the superior court reasoned that the plaintiffs had "acted unreasonably and in bad faith" by retaining LBB despite promising not to do so and by "vigorously" opposing Dr. McGuire's motion to disqualify LBB. The court additionally found that the plaintiffs had sought to use joint venture funds to pay for LBB's services and that "virtually all" of the litigation up until November 13, 2003 concerned whether LBB's representation of the plaintiffs was proper.
The plaintiffs argue that they should not be held responsible for their attorneys' misconduct, especially given that there has been no showing that their attorneys' conduct "tilted the playing field against [the] defendants."
It does not matter whether the plaintiffs knew LBB could not represent them or whether LBB's representation harmed the joint venturer defendants. The record permits a conclusion that LBB's improper representation required all of the defendants to incur some unnecessary legal fees. Awarding full reasonable attorney's fees until LBB's disqualification was therefore not an abuse of discretion.
That still leaves open what fees were reasonably incurred by which defendants, and why. We have vacated the Rule 82 awards to the joint venturer defendants, HealthSouth and Dr. McGuire. But the superior court actually entered two separate final judgments awarding fees, one jointly for defendants Bjornstad, Alaska Surgery Center, Inc., Alaska Surgery Center, Ltd., and HealthSouth, and the other jointly for Dr. McGuire and Lake Otis Professional Center, LLC. So far as we can tell based on the limited arguments on appeal on this issue, only the two joint venturer defendants (Health South and Dr. McGuire) had a valid basis for seeking disqualification of LBB as plaintiffs' counsel. The LBB dispute therefore would have been thoroughly litigated even if the plaintiffs had not sued the other defendants. We assume that because the other defendants were also parties, the disqualification dispute required them to incur some additional fees, apart from fees necessarily incurred by the two joint venturer defendants in successfully challenging LBB's representation. Separating out the other defendants' incremental fees incurred as a result of the disqualification dispute may be difficult. It may also be a needless exercise if on remand the two joint venturer defendants ultimately prevail and become eligible to recover Rule 82 fees, including enhanced fees, and if the court again enters two judgments for the two groups of defendants jointly covered by each judgment. The superior court in its discretion may wish to hold in abeyance the enhanced fee issue.
Having vacated the Rule 68 awards to defendants Bjornstad, Alaska Surgery Center, Inc., Alaska Surgery Center, Ltd., and Lake Otis Professional Center, LLC, all of *1180 whom remain prevailing parties, we remand for a redetermination of the Rule 82 fees to be awarded those defendants.[89]

IV. CONCLUSION
Because questions of material fact exist as to (1) what fiduciary duties Dr. McGuire and HealthSouth owed the plaintiffs and (2) whether the defendants breached those duties, we REVERSE the grant of summary judgment on the fiduciary duty and contract claims and REMAND for further proceedings. We AFFIRM the grant of summary judgment as to defendants Louise Bjornstad, Alaska Surgery Center, Inc., Alaska Surgery Center, Ltd., and Lake Otis Professional Center, LLC.
Because Dr. McGuire and HealthSouth are no longer prevailing parties, we VACATE their Rule 68 and Rule 82 attorney's fees awards. Because the offers of judgment were invalid, we REVERSE the Rule 68 attorney's fees awards to all defendants. We VACATE the Rule 82 awards and REMAND for reconsideration of the Rule 82 awards for the non-joint venturer defendants in light of this opinion.
FABE, Chief Justice, and MATTHEWS, Justice, not participating.
NOTES
[1] This description of the facts is taken from the pleadings and materials filed by the parties on summary judgment. Because the superior court entered summary judgment for the defendants, we take all permissible factual inferences in favor of the plaintiffs. In describing the facts in this fashion we are not resolving possible factual disputes. To the extent that there are factual disputes, they will have to be litigated in accordance with the legal conclusions reached in this opinion.
[2] Former AS 18.07.031 provided that:

(a) No person may make an expenditure of $1,000,000 or more for any of the following unless authorized under the terms of a certificate of need issued by the office:
(1) construction of a health care facility;
(2) alteration of the bed capacity of a health care facility; or
(3) addition or elimination of a category of health services provided by a health care facility.
[3] At the time of sale, the Advances joint venturers included Drs. Beal, Chandler, Coles, McGuire, Nathanson, Norman, Gills, and Sitter.
[4] Ch. 18, §§ 1, 2, SLA 2000.
[5] Ch. 48, §§ 1-3, SLA 2004.
[6] The original complaint asserted that the role of Alaska Surgery Center, Ltd. is "unclear" but that it "relates to operation of the Alaska Surgery Center."
[7] Rockstad v. Erikson, 113 P.3d 1215, 1219 (Alaska 2005) (citing Ellis v. City of Valdez, 686 P.2d 700, 702 (Alaska 1984)).
[8] Id. at 1219 (citing Witt v. State, Dep't of Corr., 75 P.3d 1030, 1033 (Alaska 2003)).
[9] Indus. Commercial Elec, Inc. v. McLees, 101 P.3d 593, 597 (Alaska 2004) (citing Alaska Rent-A-Car, Inc. v. Ford Motor Co., 526 P.2d 1136, 1139 (Alaska 1974)).
[10] Maines v. Kenworth Alaska, Inc., 155 P.3d 318, 323 (Alaska 2007) (quoting Martech Constr. Co. v. Ogden Envtl. Servs., Inc., 852 P.2d 1146, 1149 n. 7 (Alaska 1993)) (internal quotations omitted).
[11] K & K Recycling, Inc. v. Alaska Gold Co., 80 P.3d 702, 724 n. 66 (Alaska 2003) (citing Robles v. Shoreside Petroleum, Inc., 29 P.3d 838, 841 (Alaska 2001)).
[12] Norville v. Carr-Gottstein Foods Co., 84 P.3d 996, 1000 n. 1 (Alaska 2004).
[13] Id. (citing Alaska Diversified Contractors, Inc. v. Lower Kuskokwim Sch. Dist., 778 P.2d 581, 584 (Alaska 1989)).
[14] Monzingo v. Alaska Air Group, Inc., 112 P.3d 655, 659 (Alaska 2005) (quoting K & K Recycling, Inc., 80 P.3d at 712).
[15] Neal & Co., Inc. v. Ass'n of Vill. Council Presidents Reg'l Hous. Auth., 895 P.2d 497, 502 (Alaska 1995) (citing Peterson v. Wirum, 625 P.2d 866, 870 & n. 7 (Alaska 1981)).
[16] Balough v. Fairbanks N. Star Borough, 995 P.2d 245, 254 (Alaska 2000) (citing Davila v. Davila, 908 P.2d 1027, 1031 (Alaska 1995)).
[17] Id. (citing Buster v. Gale, 866 P.2d 837, 846 n. 9 (Alaska 1994)).
[18] Glamann v. Kirk, 29 P.3d 255, 259 (Alaska 2001) (citing Philbin v. Matanuska-Susitna Borough, 991 P.2d 1263, 1266 (Alaska 1999)).
[19] Ellison v. Plumbers & Steam Fitters Union Local 375, 118 P.3d 1070, 1073-74 (Alaska 2005) (citing Thomann v. Fouse, 93 P.3d 1048, 1050 (Alaska 2004)).
[20] The plaintiffs also argue that the court erred by granting summary judgment on their breach of contract claim. As far as we can see from the briefing on appeal, the fiduciary duty and contract claims are essentially coextensive. Although we do not address the contract claim separately, we do not mean to imply that the parties are foreclosed from litigating it on remand.
[21] Old Harbor Native Corp. v. Afognak Joint Venture, 30 P.3d 101, 106 (Alaska 2001) (citing Nat'l Soil Servs., Inc. v. Hurst, 630 P.2d 3, 7 (Alaska 1981)); Mathis v. Meyeres, 574 P.2d 447, 449 (Alaska 1978) (partnership is fiduciary relationship); see also Meinhard v. Salmon, 249 N.Y. 458, 164 N.E. 545, 546 (1928) (refusing to allow party to take advantage of new business opportunity without revealing full details to joint venturer).
[22] Nat'l Soil Servs., 630 P.2d at 7 (citing Note, Apparent Authority and the Joint Venture: Narrowing the Scope of Agency Between Business Associates, 13 U.C. Davis L.Rev. 831, 857 n. 132 (1980) ("The scope of fiduciary duties owed between partners inter se is often broader from that owed by joint venturers inter se.")).
[23] The defendants cite to the law review note which we cited in National Soil Services. Note, supra note 22, at 857 n. 132. That law review note stated:

While joint venturers, like partners, owe each other a fiduciary duty as to matters relating to the specific undertaking, or in the formation of the association, the fiduciary duty is less with respect to outside and possibly competing interests. In a partnership the fiduciary duty prevents any competition by a partner with the partnership business; in the joint venture it is understood at the outset that the individual business pursuits of the members are not thus to be restricted by the mere union of the parties in an isolated venture.
Id. (internal quotations and citations omitted) (emphasis added). The plaintiffs' fiduciary duty claim here primarily asserts interference with or destruction of opportunities directly related to the ownership and management of Condominium A. Because the fiduciary breach alleged here relates to the primary undertaking of the joint venture, any arguable justification for distinguishing between joint venturer and partner fiduciary duty would not apply here.
[24] AS 32.06.201-.997.
[25] AS 32.06.960 ("[R]elations between and among the partners and between the partners and the partnership are governed by the partnership agreement.").
[26] Id.
[27] Although former AS 32.05 was in effect when the joint venture was formed in 1981, we conclude that the current version of the UPA, as codified in AS 32.06, applies to this dispute. When it enacted AS 32.06 in 2000, the legislature stated that "[o]n or after January 1, 2004, sees. 1-7 of this Act apply to all partnerships and limited liability partnerships." Ch. 115, § 10, SLA 2000. The new act contained a savings clause that stated the new UPA would "not affect an action or proceeding begun or a right accrued before January 1, 2001." Ch. 115, § 11, SLA 2000. The rights at issue in this case did not accrue before 2001, the year in which the defendants relocated Alaska Surgery Center, Inc. from 4001 Laurel Street to the new facility on Lake Otis. The plaintiffs did not file their complaint until April 2003. Because neither of these events occurred before January 1, 2001, the savings clause does not apply in this case.
[28] AS 32.06.404(b)(1) & (3).
[29] AS 32.06.404(d).
[30] AS 32.06.960(b)(3)(A).
[31] Former AS 32.05.130 provided that "[t]he rights and duties of the partners in relation to the partnership shall be determined, subject to any agreement between them," by the rules outlined in that statute. (Emphasis added.) The equivalent provision in the applicable version of the UPA is AS 32.06.960(a). It provides that "relations between and among the partners and between the partners and the partnership are governed by the partnership agreement. To the extent the partnership agreement does not otherwise provide, [AS 32.06] governs relations between and among the partners and between the partners and the partnership."
[32] The plaintiffs also imply that the defendants did not preserve their section 13.07 argument in the superior court. Even though the defendants argue for the first time on appeal that section 13.07 limits their fiduciary duties, this theory closely relates to their properly preserved contention that section 2.05 limited the duty owed. We therefore consider these two theories together. See Sea Lion Corp. v. Air Logistics of Alaska, Inc., 787 P.2d 109, 115 (Alaska 1990) ("Arguments are considered on appeal if raised explicitly in the superior court, or if the issue is `1) not dependent on any new or controverted facts; 2) closely related to the appellant's trial court arguments; and 3) could have been gleaned from the pleadings,' or if failure to address the issue would propagate `plain error.'" (quoting State v. Nw. Constr., Inc., 741 P.2d 235, 239 (Alaska 1987))).
[33] The original joint venture agreement of 1981 defined "Partnership" to mean "joint venture." The 1982 agreement does not define "Partner" or "Partnership." The 1981 agreement also defined "Majority-in-Interest of the Partners" to mean: "one (1) or more of the Partners who at the time are entitled to an aggregate of seventy percent (70%) or more of the net profits and/or losses then allocable to all Partners then living and not incompetent, Bankrupt or Insolvent, pursuant to the provisions hereof." Because each of the nine joint venturers had an equal ownership share, the majority-in-interest was seven or more of the joint venturers. The 1982 agreement defines "Majority-in-Interest" in substantially similar terms.
[34] We assume the term "Property" was intended in context to refer either to 4001 Laurel Street or to Condominium A.
[35] Leisnoi, Inc. v. Stratman, 956 P.2d 452, 454 (Alaska 1998) (citing Municipality of Anchorage v. Gentile, 922 P.2d 248, 256 (Alaska 1996)).
[36] Id. at 454 (citing Gentile, 922 P.2d at 256 n. 5).
[37] AS 18.07.031(c).
[38] Section 5.04 states that the joint venturers cannot, "without the consent of the Majority-in-Interest of the Partners . . . (v) do any act detrimental to the best interests of the Partnership; or (vi) do any act which would make it impossible to carry on the business of the Partnership."

Per the joint venture agreement, any seven Advances members together would be entitled to seventy percent of Advances's profit and thereby be the joint venture's majority-in-interest. For a definition of "Majority-in-Interest of the Partners," see note 33.
[39] Starr v. Int'l Realty, Ltd., 271 Or. 396, 533 P.2d 165, 169 (1975).
[40] Id. at 166-67.
[41] Id. at 169 (internal quotations omitted).
[42] Wirum & Cash, Architects v. Cash, 837 P.2d 692, 701 (Alaska 1992).
[43] Id. at 701 (quoting Skone v. Quanco Farms, 261 Cal.App.2d 237, 68 Cal.Rptr. 26, 29 (1968)).
[44] Id. (citing Starr, 533 P.2d at 168-69).
[45] The plaintiffs argued in the superior court that Dr. McGuire and HealthSouth were liable for attempting to influence the legislative process. They have not renewed this argument on appeal. There is consequently no need to consider whether the superior court was correct in holding that the Noerr-Pennington doctrine shielded the defendants from liability for seeking the 2000 legislative changes.
[46] E. R.R. Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961).
[47] United Mine Workers v. Pennington, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965).
[48] Noerr, 365 U.S. at 136, 81 S.Ct. 523.
[49] Azzar v. Primebank, FSB, 198 Mich.App. 512, 499 N.W.2d 793, 795-96 (1993) (holding that bank directors' actions in successfully petitioning Federal Home Loan Bank Board to oppose shareholders' attempt to acquire bank stock was attempt to influence governmental action and immune from liability for breach of fiduciary duty).
[50] Cf. Gunderson v. Univ. of Alaska, Fairbanks, 902 P.2d 323, 329 (Alaska 1995) (quoting Liberty Lake Invs., Inc. v. Magnuson, 12 F.3d 155, 158 (9th Cir.1993)) (holding that "[a]llegations of fraud and misrepresentation in the judicial process will only block Noerr-Pennington immunity when such allegations go `to the core of a lawsuit's legitimacy'"); see also Cheminor Drugs, Ltd. v. Ethyl Corp., 168 F.3d 119 (3d Cir.1999) (stating that "[w]hile we do not condone misrepresentations in a judicial setting, neither will we deprive litigants of immunity derived from the First Amendment's right to petition the government if the alleged misrepresentations do not affect the core of the litigant's . . . case").
[51] AS 18.07.081(d) provides that a CON may be revoked if:

(1) the sponsor has not shown continuing progress toward commencement of the activities authorized under AS 18.07.041 or 18.07.043 after six months of issuance;
(2) the applicant fails, without good cause, to complete activities authorized by the certificate;
(3) the sponsor fails to comply with the provisions of this chapter or regulations adopted under this chapter;
(4) the sponsor knowingly misrepresents a material fact in obtaining the certificate;
(5) the facts charged in an accusation filed under (c) of this section are established; or
(6) the sponsor fails to provide services authorized by the terms of the certificate.
[52] Ch. 275, § 4, SLA 1976.
[53] Greenwood Manor v. Iowa Dep't of Pub. Health, State Health Facilities Council, 641 N.W.2d 823, 837 (Iowa 2002) (holding that petitioning nursing facilities had failed to demonstrate establishment of property interest in competitor facility's certificate of need application).
[54] Downriver Nursing Assocs. v. Michigan Dep't of Pub. Health, 193 Mich.App. 594, 484 N.W.2d 748, 751 (1992) (holding that state did not deprive plaintiff of use of its property interest).
[55] Id. at 751 (quoting Gulf Court Nursing Ctr. v. Dep't of Health & Rehabilitative Servs., 483 So.2d 700, 708 (Fla.App.1985)).
[56] Watkins v. Restorative Care Ctr., 66 Wash.App. 178, 831 P.2d 1085, 1090 (1992).
[57] Id. at 1090 (emphasis in original).
[58] Valley Hosp. Ass'n v. Mat-Su Coal, for Choice, 948 P.2d 963, 970 (Alaska 1997).
[59] S. Cent. Health Planning & Dev., Inc. v. Comm'r of Dep't of Admin., 628 P.2d 551, 553 (Alaska 1981) ("If there is a surplus of similar facilities in the area there may be unnecessary duplication of health resources.").
[60] Valley Hosp., 948 P.2d at 970 (concluding that CON program created type of health care monopoly in only hospital serving Mat-Su Valley).
[61] Dr. Nathanson stated in his 2006 affidavit that Advances was "being told that it is not likely another CON will be issued in the near future for an ambulatory surgery center in the Anchorage area." Dr. McGuire testified in his deposition that he had recommended that HealthSouth pursue legislative change to the law in the late nineties because he believed it would be "difficult" to obtain a new CON.
[62] Ch. 275, § 4, SLA 1976.
[63] AS 18.07.081(d)(6).
[64] See, e.g., AS 18.07.081(d)(6).
[65] Wirum & Cash, Architects v. Cash, 837 P.2d 692, 712 (Alaska 1992) (concluding that, because partner had entrusted his wife to manage partnership's financial records, wife also owed fiduciary duty to partnership).
[66] Ellison v. Plumbers & Steam Fitters Union Local 375, 118 P.3d 1070, 1077 (Alaska 2005) (applying Restatement test to claims against third parties for aiding and abetting discrimination (quoting RESTATEMENT (SECOND) OF TORTS § 876(b) (1979))).
[67] Rathke v. Corr. Corp. of America, Inc., 153 P.3d 303, 312 (Alaska 2007) (quoting Jones v. Cent. Peninsula Gen. Hosp., 779 P.2d 783, 791 (Alaska 1989)); see also Domke v. Alyeska Pipeline Serv. Co., 137 P.3d 295, 307 (Alaska 2006) (citing Jensen v. Alaska Valuation Serv., Inc., 688 P.2d 161, 162-63 (Alaska 1984)) (recognizing that agents cannot be personally liable for breach of contract if both their agency and identity of principal are disclosed).
[68] Jones, 779 P.2d at 791.
[69] Ch. 18, §§ 1-2, SLA 2000.
[70] Ch. 48, §§ 1-3, SLA 2004.
[71] Because Dr. McGuire did not make a valid offer of judgment to Dr. Gills, the court concluded that Dr. Gills would, under Rule 82, be liable for only twenty percent of the attorney's fees Dr. McGuire incurred after LBB was disqualified.
[72] Ellison v. Plumbers & Steam Fitters Union Local 375, 118 P.3d 1070, 1078 (Alaska 2005) (vacating Rule 82 awards for work performed before settlement offers were made while retaining higher Rule 68 fees awards for work performed after settlement offers).
[73] The defendants argue that the Rule 68 and Rule 82 fees awards correspond to "entirely separate actions," because the plaintiffs changed counsel, amended their complaint, and engaged in more extensive discovery once the issue of LBB's disqualification had been resolved. These circumstances do not establish that there were two different cases. Nor are awards under both rules necessary to hold plaintiffs responsible for their "vexatious conduct related to the inappropriate use of LBB."
[74] Alaska R. Civ. P. 68.
[75] AS 09.30.065; Alaska R. Civ. P. 68.
[76] AS 09.30.065(a)(1); Alaska R. Civ. P. 68.
[77] Warr v. Williamson, 359 Ark. 234, 195 S.W.3d 903, 904 (2004); Century 21 Today Inc., v. Tarrant, No. 240696, 2003 WL 22443624, 1 (Mich. App.2003).
[78] Warr, 195 S.W.3d at 907 (reversing Rule 68 fee award based on defendant's one dollar offer of judgment and stating that to obtain protection and benefit of Rule 68, "a defendant must make a good faith offer, or in other words, an offer sufficient to compel the plaintiff to reassess his or her case. It is difficult to imagine any circumstances under which an offer of one dollar would compel a plaintiff to seriously consider settling a case"); Century 21, 2003 WL 22443624 at 1 (holding trial court did not err in declining to award defendants attorney's fees based on one dollar offer of judgment and stating, first, that "where a party employs gamesmanship by making a de minimis offer of judgment early in a case in the hopes of tacking attorney fees to costs if successful at trial, and the party's objective is not settlement" and, second, that one dollar offer has "little if any chance of seriously opening negotiations or of settling a case," it would be hard to construe it as "genuine attempt at settlement").
[79] Lowell v. Hayes, 117 P.3d 745, 760 n. 76 (Alaska 2005).
[80] Id. (citing Beattie v. Thomas, 99 Nev. 579, 668 P.2d 268, 274 (1983) (requiring courts evaluating validity of offers of judgment to consider: (1) whether plaintiff's claim was brought in good faith; (2) whether defendants' offer of judgment was reasonable and in good faith in both its timing and amount; (3) whether plaintiff's decision to reject offer and proceed to trial was grossly unreasonable or in bad faith; and (4) whether fees sought by offeror are reasonable and justified in amount)).
[81] Id.
[82] Id.
[83] The defendants served their offers of judgment between June and October 2003. Although HealthSouth, Dr. McGuire, and Alaska Surgery Center, Inc. had filed counterclaims before making their offers, defendants Alaska Surgery Center, Ltd. and Louise Bjornstad did not file their counterclaims until long after their offer expired.
[84] Beattie, 668 P.2d at 274; see Warr, 195 S.W.3d at 907.
[85] Progressive Corp. v. Peter ex rel. Peter, 195 P.3d 1083, 1088 (Alaska 2008).
[86] See Fernandes v. Portwine, 56 P.3d 1, 9 (Alaska 2002).
[87] Municipality of Anchorage v. Anchorage Police Dep't Employees Ass'n, 839 P.2d 1080, 1091-92 (Alaska 1992) (quoting State v. Univ. of Alaska, 624 P.2d 807, 817 (Alaska 1981)); see Alaska R. Civ. P. 82(b)(3)(G).
[88] Id. at 1092 (quoting Moses v. McGarvey, 614 P.2d 1363, 1368-69 (Alaska 1980)).
[89] We also note that if the joint venture defendants are not prevailing parties on remand, a Rule 82 award of partial fees to the other defendants may raise allocation issues.